******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* GERJUAN
RAINER TYUS
(AC 40093)

Lavine, Sheldon and Harper, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of
the victim, the defendant appealed, claiming, inter alia, that the trial
court abused its discretion in granting the state's motion to join his case
for trial with that of A, who also was involved in the shooting. The
defendant also had been charged with conspiracy to commit murder,
but the trial court dismissed that charge prior to trial. The defendant
and A had driven to a café, where A shot the victim. A later told E that
he had shot someone. The defendant claimed, inter alia, that he would
be substantially prejudiced if his case was joined with A's case for trial
because A's statement to E would be admissible in evidence as a party
admission against A. The defendant further asserted that A's statement
to E could not be admitted under the coconspirator exception to the
hearsay rule under the applicable provision (§ 8-3 [1]) of the Connecticut
Code of Evidence (2008) because the conspiracy charge had been dis-
missed. The trial court also denied the defendant's motion to preclude
testimony from the state's firearms examiner, S, about S's examination
of and conclusions about certain firearms evidence that had been exam-
ined by another state's examiner who had since died and, thus, was
not available for cross-examination. The defendant claimed that his
constitutional right to confrontation would be violated if S testified
about the firearms evidence. *Held*:

1. The trial court committed no error in granting the state's motion to join
the defendant's case with A's case for trial, as both cases arose from
the same incident, virtually all of the state's testimonial, documentary,
physical and scientific evidence against the two defendants would have
been admissible against either of them if they had been tried separately,
their defenses were not antagonistic and each was the other's principal
alibi witness; moreover, A's statement to E was admissible against the
defendant under the coconspirator exception to the hearsay rule, as
Connecticut follows the general American rule that the coconspirator
exception is applicable in cases where no formal charge of conspiracy
has been made, and the defendant presented no other basis for claiming
that his case should not have been joined with A's case for trial.

2. The defendant could not prevail on his claim that the trial court violated
his right to confrontation when it permitted S to testify about S's exami-
nation of and conclusions regarding the firearms evidence; the only
inculpatory conclusions or statements regarding the firearms evidence
were made by S in court, S conducted his own physical examination
of and formulated his own conclusions about the evidence, S did not
rely on the deceased examiner's report, which was not admitted into
evidence, and the defendant cross-examined S extensively.

3. The trial court did not err in denying the defendant's request for a limiting
instruction to the jury regarding S's testimony; the defendant's requested
instruction and the court's instruction were substantially similar, the
court properly instructed the jury as to its role in assessing the credibility
of expert witnesses and determining the weight to be given to expert
testimony, and although the court declined to the defendant's request
to highlight S's testimony, the court's instructions were correct in law,
adapted to the issues and sufficient to guide the jury.

Argued May 15—officially released September 11, 2018

*Procedural History*

Substitute information charging the defendant with
the crimes of murder and conspiracy to commit murder,
brought to the Superior Court in the judicial district of
New London, where the court, *Jongbloed, J.*, granted

the defendant's motion to dismiss the charge of conspiracy to commit murder and granted the state's motion to consolidate the case for trial with that of another defendant; thereafter, the matter was tried to the jury before *A. Hadden, J.*; subsequently, the court, *A. Hadden, J.*, denied the defendant's motion to preclude certain evidence; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Pamela S. Nagy*, assistant public defender, for the appellant (defendant).

*Paul J. Narducci*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *David J. Smith*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Gerjuan Rainer Tyus, appeals from the judgment of conviction, which was rendered against him after a jury trial, on the charge of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims (1) that the trial court abused its discretion in granting the state's motion to join his case for trial with that of his codefendant, Darius Armadore; (2) that he was deprived of his constitutional right to confrontation when the state's firearms examiner was permitted to testify regarding the findings of another firearms examiner, who was deceased, and thus unavailable to testify at trial; and (3) that the court erred in denying his request for a limiting instruction to the jury concerning the testimony of the state's firearms examiner.[1] We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In early December, 2006, the defendant was involved in an ongoing dispute with Todd Thomas regarding a piece of jewelry that Thomas' brother had given to the defendant. Thomas demanded that the defendant give him the jewelry, but the defendant refused to do so unless Thomas paid him $10,000.

On December 3, 2006, there was a drive-by shooting near the defendant's residence on Willetts Avenue in New London. In that incident, Thomas, who was a passenger in a white Lexus that was registered to his wife, fired several gunshots at the defendant with a .38 caliber firearm, striking him in the leg and the back. The defendant returned fire at Thomas, firing five gunshots with a nine millimeter firearm. Four .38 caliber cartridge casings and five nine millimeter cartridge casings were recovered from the scene of the shooting on Willetts Avenue. Later that day, while the defendant was at a hospital being treated for his wounds, his close friend, Darius Armadore, who was at the hospital waiting for news of the defendant's condition, was overheard to say, "we're gonna get them niggas . . . ."

At approximately 7 p.m. on December 22, 2006, the defendant and Armadore went to Boston to visit family and pick up three girls in a silver Chevrolet Impala that the defendant had rented on December 15, 2006. When one of the three girls refused to return to Connecticut with them, the defendant and Armadore returned to Connecticut with the other two girls.

Later that evening, at approximately 11 p.m. on December 22, 2006, Thomas arrived at Ernie's Café on Bank Street in New London. Shortly after midnight on that evening, while Thomas was outside Ernie's smoking a cigarette, he was shot in the head. A light skinned African-American male was observed fleeing from the place where Thomas fell, running first down Bank Street toward the corner of Golden Street, then up

Golden Street to a municipal parking lot, where he entered the passenger's side of a silver car that had been waiting there with its motor running. As soon as the fleeing man entered the waiting vehicle, it sped away. Thomas was transported to Lawrence + Memorial Hospital, where he was pronounced dead on arrival.

Later, at approximately 12:45 a.m., the defendant and Armadore arrived at Bella Notte, a nightclub in Norwich. Tracking information on records produced by their cell service providers established that their three cell phones—the defendant had two cell phones in his possession and Armadore had one—had been brought from Boston to New London at approximately 11:45 p.m. All three phones activated cell towers in New London, in the vicinity of Ernie's, minutes before a 911 call was received reporting the shooting outside of Ernie's. Thereafter, between 12:30 and 12:42 a.m., the three cell phones were taken from New London to Norwich, where they activated a cell tower in close proximity to Bella Notte.[2] A few hours later, at approximately 4 a.m., the defendant dropped Armadore off at the apartment that he shared with his then girlfriend, Ritchae Ebrahimi. After arriving at the apartment, Armadore told Ebrahimi that he had shot someone that night.

One nine millimeter cartridge casing was recovered from the scene of Thomas' December 23, 2006 shooting outside of Ernie's. A comparison of that cartridge casing to the five nine millimeter cartridge casings recovered from the scene of the defendant's December 3, 2006 shooting on Willetts Avenue revealed that all six had been fired from the same firearm.

On November 20, 2012, the defendant and Armadore were both arrested in connection with the shooting death of Thomas on charges of murder in violation of § 53a-54a, and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. The conspiracy charges against both defendants were later dismissed on the ground that they were barred by the statute of limitations. The state thereafter filed long form informations charging the defendant and Armadore with murder, both as a principal and as an accessory, in violation of General Statutes §§ 53a-8 and 53a-54a (a). The cases were subsequently joined for trial, then tried together before a single jury, which returned guilty verdicts as to both defendants without specifying whether such verdicts were based on principal or accessorial liability. The court sentenced the defendant to a term of fifty-five years of incarceration. This appeal followed.[3]

I

The defendant first claims that the court abused its discretion in granting the state's motion to join his case with Armadore's case for trial.[4] We disagree.

On April 7, 2015, the state filed a motion, pursuant

to Practice Book § 41-19, for joinder of the defendant's and Armadore's cases for trial. The state argued that joinder of the two cases would promote judicial economy because, as the court ruled, "virtually all of the witnesses [it] would call in [the defendant]'s trial would be called in the trial of [Armadore]," and the physical and scientific evidence that it would seek to introduce in both cases would be identical. The state further argued that the respective defenses of the defendant and Armadore were not antagonistic, and thus that neither would suffer substantial injustice if their cases were tried together.

On April 27, 2015, the defendant filed an objection to the state's motion for joinder. The defendant argued that Ebrahimi's testimony that Armadore had told her, in the early morning hours of December 23, 2006, that he had shot someone earlier that morning was hearsay that would not be admissible in the state's case against him if he were tried alone and, thus, that by joining his case with the state's case against Armadore, against whom the statement was admissible as a party admission, he would be substantially prejudiced. The defendant argued that the only conceivable basis on which the state could introduce Armadore's statement to Ebrahimi against him would be pursuant to the coconspirator exception to the hearsay rule, but because the conspiracy charge against him had been dismissed, the statement could not properly be admitted on that basis.

The court heard argument on the state's motion for joinder on May 18, 2015. On October 6, 2015, the court orally granted the motion, explaining its ruling as follows: "The court finds that joinder of the cases will clearly advance judicial economy in this case. Virtually all of the witnesses called in one trial would be called in the trial of the other. The physical and the scientific evidence would also be virtually identical. Moreover, joinder would not substantially prejudice the rights of the defendants. Based on the court's review of the statements of the defendants as set forth by the state in its memorandum, it appears that the defenses are not irreconcilable or antagonistic. Both have admitted being with the other on the night in question, and the statements of each do not implicate the other." The court thus found that a joint trial would not be unfairly prejudicial, and so it granted the state's motion for joinder.

On appeal, the defendant claims, as he did at trial, that the joinder of his case with Armadore's was improper because Ebrahimi's testimony about Armadore's admission to her that he had shot someone on the evening of Thomas' killing was not admissible against him under the coconspirator exception to the hearsay rule, and thus that its introduction and use against him in his joint trial with Armadore caused him unfair prejudice. We are not persuaded.

Practice Book § 41-19 provides that "[t]he judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together." The paramount concern in ordering a joint trial is whether the defendant's right to a fair trial will be impaired. "The argument for joinder is most persuasive when the offenses are based upon the same act or criminal transaction, since it seems unduly inefficient to require the state to resolve the same issues at numerous trials. . . . In contrast, when the cases are not of the same character, the argument for joinder is far less compelling because the state must prove each offense with separate evidence and witnesses [thus] eliminat[ing] any real savings in time or efficiency which might otherwise be provided by a single trial." (Internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 157, 51 A.3d 1048 (2012). "A joint trial expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve upon juries, and avoids the necessity of recalling witnesses who would otherwise be called to testify only once." (Internal quotation marks omitted.) *State* v. *Madore*, 96 Conn. App. 235, 240, 899 A.2d 721, cert. denied, 280 Conn. 907, 907 A.2d 92 (2006).

"A separate trial will be ordered where the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused. . . . [T]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials." (Internal quotation marks omitted.) Id., 239–40.

"[I]t is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . . [I]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb." (Citation omitted; internal quotation marks omitted.) *State* v. *Devon D.*, 321 Conn. 656, 665, 138 A.3d 849 (2016).

In this case, it is undisputed that the state's cases against the defendant and Armadore arose from the same criminal incident—the shooting death of Thomas—and that virtually all of the state's testimonial and documentary evidence at their joint trial, as well as all of its physical and scientific evidence against the two defendants, would have been admissible against either of them had they been tried separately. The defendants' defenses to the charges against them were not antagonistic. In fact, they each served as the other's

principal alibi witness, insisting that they had been together at Bella Notte in Norwich when Thomas was shot and killed in New London.

The defendant argued before the trial court, and now reiterates before us, that Armadore's statement to Ebrahimi about shooting someone on the evening of Thomas' shooting could only have been admitted into evidence against him if it qualified for admission under the coconspirator exception to the hearsay rule. He insists, however, that that exception did not apply in this case because, by the time the joint trial began, the conspiracy charges against him and Armadore had been dismissed. The defendant asserted no other evidentiary basis for excluding Armadore's admission to Ebrahimi, and in fact conceded that it could have been admitted against him under the coconspirator exception had his conspiracy charge still been pending at the time.[5]

The defendant's argument that joinder of his case and Armadore's for trial was improper must be rejected because the central premise on which that argument rests, which is that in the absence of a pending charge of conspiracy, Armadore's admission to Ebrahimi was not admissible against the defendant under the coconspirator exception to the hearsay rule, is completely unfounded as a matter of law. At all times relevant to this case, the coconspirator exception to the hearsay rule has been codified in § 8-3 of the Connecticut Code of Evidence (2008), which provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness: (1) Statement by a party opponent. A statement that is being offered against a party and is . . . (D) a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy . . . ." So phrased, the rule lists no requirement that limits its application to criminal cases involving charges of conspiracy. To the contrary, consistent with Connecticut's pre-code case law which the Code of Evidence was designed to adopt and codify, the rule's official commentary expressly explains the rule's scope: "(1) Statement by party opponent. Sections 8-3 (1) sets forth six categories of party opponent admissions that were excepted from the hearsay rule at common law . . . . (D) The fourth category encompasses the hearsay exception for statements of coconspirators. . . . The exception is applicable in civil and criminal cases alike. See *Cooke* v. *Weed*, 90 Conn. 544, 548, 97 A. 765 (1916)." Conn. Code Evid. (2008) § 8-3 (1), commentary.

In light of such controlling authority, it is apparent that Connecticut follows the general American rule as to the applicability of the coconspirator exception to the hearsay rule in cases where no formal charge of conspiracy has been made. That rule has been aptly summarized as follows: "A conspiracy need not be formally charged for coconspirator statements to be

admissible if a conspiracy in fact exists. Likewise, the declarant need not be charged, and acquittal of conspiracy charges does not preclude use of his or her statement. The evidence is similarly admissible in civil cases, where the conspiracy rule applies to tortfeasors acting in concert." (Footnotes omitted.) 2 K. Broun, McCormick on Evidence (7th Ed. 2013) § 259, pp. 294–95. Accordingly, because the defendant presented no other basis for claiming that his case should not have been joined with Armadore's case for trial, we conclude that the trial court committed no error in ordering joinder in this case.

## II

The defendant next claims that the court erred in admitting the testimony of the state's firearms examiner, James Stephenson, because Stephenson's opinions regarding the firearms evidence in this case were assertedly based on the findings and conclusions of the primary examiner of the evidence in this case, Gerald Petillo, who died before trial. The defendant claims that Stephenson did not conduct "a true independent examination" of the evidence, but, rather, in formulating his conclusions, he relied on Petillo's findings and conclusions. The defendant argues that because Stephenson's testimony was based on Petillo's findings and conclusions, and Petillo was unavailable for cross-examination, Petillo's findings and conclusions constituted testimonial hearsay, and the admission of evidence on the basis of that hearsay, specifically, Stephenson's testimony, violated his constitutional right to confrontation. We disagree.

In *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the United States Supreme Court held that testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. Id., 68. The United States Supreme Court's subsequent decisions in *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), extended the holding in *Crawford* to apply the confrontation clause in the specific context of scientific evidence.

In *Melendez-Diaz*, the court held that certificates signed and sworn to by state forensics analysts, which set forth laboratory results of drug tests that were done by those analysts and which were admitted into evidence in lieu of live testimony from the analysts themselves, were testimonial within the meaning of *Crawford*, and thus that they were improperly admitted because the defendant did not have an opportunity to cross-examine those analysts. *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 311.

In *Bullcoming*, the court held that the confrontation clause does not permit the prosecution to introduce a forensic laboratory report containing a testimonial statement by an analyst, certifying to the results of a blood alcohol concentration test he performed, through the in-court testimony of another scientist "who did not sign the certification or perform or observe the test reported in the certification." *Bullcoming* v. *New Mexico*, supra, 564 U.S. 652. In short, an accused has the right "to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." Id.

Thus, in *Crawford*, *Melendez-Diaz*, and *Bullcoming*, the trial court's violation of the defendant's confrontation rights occurred because certain inculpatory statements were admitted that were testimonial in nature and were made against the defendant by an individual who was not subject to cross-examination. See *State* v. *Buckland*, 313 Conn. 205, 215–16, 96 A.3d 1163 (2014), cert. denied, U.S. , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015). Those circumstances are not present in this case.

Here, the defendant and Armadore filed a joint motion in limine to preclude Stephenson's testimony on the ground that his testimony would not be based on his own independent examination of the firearms evidence in this case, but, rather, would be based on the examination of that evidence by Petillo, who was not available for cross-examination by the defendant, and thus that his constitutional right to confrontation would be violated if Stephenson were permitted to so testify. The court held a hearing outside of the presence of the jury on the defendants' motion to preclude Stephenson's testimony. Stephenson testified that when firearms comparisons are made, the technical reviewer would "go in, using the comparison microscope, look at the comparisons himself to make a determination as to whether the conclusions were correct that were going to be issued in the report." The technical reviewer would make an independent determination concerning the comparisons that were made. Stephenson acted as the technical reviewer of Petillo's conclusions in this case. In that capacity, Stephenson examined the firearms evidence himself and formulated his own opinions as to the evidence he was examining. In this case, Petillo had performed various tests on the firearms evidence that had been collected and authored a report containing his findings and analysis. Stephenson physically examined the cartridge cases in this case and in the incident on December 3, 2006. He did not merely verify what Petillo had concluded, but came to his own conclusions on the basis of his examination of the evidence before him.

The trial court concluded that "this case is in stark

contrast to [*Melendez-Diaz* and *Bullcoming*]. This is not a situation in which the state attempts to elicit testimony from the deceased examiner. . . . [Stephenson] conducted his own independent examination and reached his own independent conclusions. He is clearly entitled to testify as to those findings because he is available and he made conclusions and he will be cross-examined." On that basis, the court concluded that Stephenson's testimony was admissible. We agree.

Here, the only inculpatory conclusions or statements regarding the firearms evidence that were presented to the jury were made by Stephenson in court. Stephenson did not rely on Petillo's report in formulating his own conclusions, nor was Petillo's report admitted into evidence. Although Stephenson reviewed Petillo's report, he conducted his own physical examination of the evidence in this case and came to his own conclusions, which happened to be consistent with Petillo's conclusions. The defendant cross-examined Stephenson extensively. Because the defendant was afforded a full opportunity to confront Stephenson regarding his examination of, and conclusions regarding, the firearms evidence in this case, his claim that he was denied his constitutional right to confrontation is without merit.

### III

The defendant also claims that the court erred in denying his request for a limiting instruction to the jury regarding Stephenson's testimony. Specifically, the defendant claims that a "limiting instruction was necessary given the problems with firearms identification." In response, the state contends that the court's general instruction on expert testimony was sufficient to guide the jury in its assessment of Stephenson's testimony. We agree with the state.[6]

"We review nonconstitutional claims of instructional error under the following standard. While a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . A challenge to the validity of jury instructions presents a question of law over which this court has plenary review." (Citation omitted; internal quotation marks omitted.) *State* v. *Crosby*, 182 Conn. App. 373, 410–11,     A.3d    (2018).

Here, the defendant filed a written request for a limiting instruction regarding Stephenson's testimony "to ensure the jury retains its fact-finding function and does

not place undue weight on the conclusions expressed by the forensic firearm examiner.'' The defendant asked that the jury be instructed as follows: "You are also to consider each expert witness' general credibility in accordance with the instruction on credibility applicable to all witnesses.

"Amongst the expert witness testimony you heard in this case was the testimony of a forensic firearm examiner, James Stephenson. Mr. Stephenson expressed various opinions about certain bullet casing and projectile evidence in this case. Please understand that Mr. Stephenson's opinions in this case are not to be treated by you as scientifically definitive. By that I mean that the probability of his opinion being correct is for you, and you alone, to determine. Your determination of that issue should be guided by the principles that apply to weighing the testimony of any expert witness, including the witness' general credibility."

The trial court declined to give the instruction requested by the defendant, explaining: "In regard to the request to charge regarding expert testimony, I do believe that the charge that I have included in my proposal does, in fact, convey all of the appropriate information that's requested by [defense counsel] in his request to charge, and I do not intend to alter it in order to adopt the specific language that is suggested by [him]."

The court thereafter instructed the jury concerning expert testimony as follows: "In this case, certain witnesses have taken the [witness] stand, given their qualifications and testified as expert witnesses. A person is qualified to testify as an expert if he or she has special knowledge, skill, experience, training or education sufficient to qualify him or her as an expert on the subject to which the testimony relates. An expert is permitted not only to testify to facts that he or she personally observed, but also to state an opinion about certain circumstances. This is allowed because an expert, from experience, research and study, [is] supposed to have a particular knowledge on the subject of the inquiry and be more capable than a layperson of drawing conclusions from facts and basing his or her opinion upon them.

"Such testimony is presented to you to assist you in your deliberations. No such testimony is binding upon you, however, and you may disregard such testimony either in whole or in part. It is for you to consider the testimony with the other circumstances in the case, and using your best judgment, determine whether you will give any weight to it, and, if so, what weight you will give to it. The testimony is entitled to such weight as you find the expert's qualifications in his or her field entitle it to receive, and it must be considered by you, but it is not controlling upon your judgment."

A comparison of the defendant's requested instruction with the instruction given to the jury reveals that they are substantially similar. The court properly instructed the jury as to its exclusive role in assessing the credibility of expert witnesses and determining the weight to be given to expert testimony. Although the court declined to highlight Stephenson's testimony specifically, as requested by the defendant, there was no substantive difference between the substance of the defendant's requested instruction and the instruction given by the court. Because the court's instructions were correct in law, adapted to the issues and sufficient to guide the jury, we cannot conclude that they were improper.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also claims that the court erred when it admitted testimony and documentary evidence of cell phone data, absent any objection by the defendant or Armadore, without qualifying the witness as an expert or holding a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to determine its reliability. Because this claim is evidentiary in nature, and the defendant failed to preserve it at trial, we decline to review it. See *State* v. *Turner*, 181 Conn. App. 535, 549–55, 187 A.3d 454 (2018).

[2] The defendant and Armadore claimed that they had been at Bella Notte when Thomas was shot and killed in New London.

[3] Armadore also has challenged his conviction in a separate appeal.

[4] The defendant also claims that the court erred in failing to sever the two cases as the trial progressed and that the spillover effect of the evidence clearly prejudiced him. The defendant did not object to any of the evidence that he now claims prejudiced him, nor did he request a limiting instruction regarding that evidence. His claim in this regard is therefore not preserved and we decline to review it.

[5] In his objection to the state's motion for joinder, the defendant conceded, for purposes of its objection, that "the state will be able to show that Armadore's statement was made (1) while the conspiracy was ongoing and (2) in furtherance of the conspiracy." The defendant also "assumes that the state will also have made the threshold showing of the existence of a conspiracy in order that this statement [may] be properly offered, let alone admitted."

[6] The defendant asks this court to exercise its supervisory authority over the administration of justice to create a rule requiring trial courts to give a cautionary instruction warning juries that firearms identification testimony is not scientifically definitive. He argues: "Given that jurors often give undue reliance on expert opinions [on firearms identification], an instruction is necessary to protect future defendants against the risk of wrongful convictions."

"The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 765, 91 A.3d 862 (2014). We are unpersuaded that the issue at hand calls for such an extraordinary remedy.