******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DARIUS ARMADORE
## (AC 40481)

Lavine, Sheldon and Harper, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting of the
victim, the defendant appealed, claiming, inter alia, that the trial court
abused its discretion in granting the state's motion to join his case for
trial with that of T, who also was involved in the shooting. The defendant
and T had driven to a café, where T fatally shot the victim several weeks
after a drive-by shooting during which the victim had shot and wounded
T. C, the mother of T's son, went to the hospital where T had been
taken and saw the defendant, who she had never seen or met, and heard
him make statements that she interpreted as a vow to get back at the
people who had shot T. C later learned the defendant's identity and
identified him at trial as the man she overheard at the hospital. A few
hours after the shooting of the victim, T dropped the defendant off at
the apartment that the defendant shared with his then girlfriend, E,
where the defendant told E that he had shot someone. *Held*:

1. This court declined to review the defendant's unpreserved claim that the
   trial court committed plain error in granting the state's motion to join
   his and T's cases for trial, which was based on the defendant's assertion
   that the joinder of the cases substantially prejudiced him because the
   jury had heard certain evidence that was allegedly inadmissible as to
   the defendant; the defendant's claim, which differed from his claim at
   trial that his defenses and that of T were antagonistic because each had
   made statements that could prove harmful to the other, did not present
   an extraordinary situation in which the alleged error was so obvious
   as to affect the fairness and integrity of and public confidence in the
   judicial proceedings, as both the defendant's and T's cases arose from
   the same incident, virtually all of the state's testimonial, documentary,
   physical and scientific evidence would have been admissible against
   the defendant and T if they were tried separately, and their defenses
   were not antagonistic.

2. The defendant could not prevail on his claim that the trial court violated his
   right to confrontation when it permitted testimony by a state's firearms
   examiner about his examination of and conclusions as to certain firearms
   evidence that previously had been examined by another state's examiner
   who died prior to the trial, and, thus, was not available for cross-examina-
   tion; the only inculpatory conclusions or statements regarding the fire-
   arms evidence were made in court by the firearms examiner, who did
   not rely on the deceased examiner's report, which was not admitted
   into evidence, but conducted his own physical examination of and formu-
   lated his own conclusions about the evidence, and was cross-examined
   extensively by the defendant.

3. The defendant could not prevail on his unpreserved claim that the trial
   court improperly permitted C to make an in-court identification of him
   in the absence of a showing that she previously had made a nonsugges-
   tive out-of-court identification of him; although C's identification of the
   defendant was improper under the recent requirement by our Supreme
   Court in *State* v. *Dickson* (322 Conn. 410) that first time in-court identifi-
   cations implicate due process protections and must be prescreened by
   the trial court, the admission of C's identification was harmless beyond
   a reasonable doubt in light of the entire record, including the strength
   of the state's case against the defendant, without the evidence of C's
   identification, and the trial court's instruction to the jury as to how it
   should weigh identification evidence.

4. The defendant's claim that the trial court improperly admitted into evi-
   dence testimony as to a certain phone conversation was unavailing, the
   defendant's bald objection to the testimony, absent any articulation of
   the basis for his objection, having been insufficient to preserve his claim
   for review.

5. The defendant could not prevail on his claim that the trial court improperly
   admitted as a prior consistent statement certain testimony from the

mother of E, about his alleged confession to E; the defendant's claim, which was based on his assertion that there was no context to E's statement that he had confessed to her and no indication of what caused her to reach that conclusion, ignored the question that immediately followed the challenged portion of the mother's testimony, which provided the context that the defendant claimed was missing.

Argued May 15—officially released November 13, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of murder and conspiracy to commit murder, brought to the Superior Court in the judicial district of New London, where the court, *Jongbloed, J.*, granted the defendant's motion to dismiss the charge of conspiracy to commit murder and granted the state's motion to consolidate the case for trial with that of another defendant; thereafter, the matter was tried to the jury before *A. Hadden, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Emily Graner Sexton*, assigned counsel, with whom was *Matthew C. Eagen*, assigned counsel, for the appellant (defendant).

*Paul J. Narducci*, senior assistant state's attorney, with whom were *David J. Smith*, senior assistant state's attorney, and, on the brief, *Michael L. Regan*, state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Darius Armadore, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a). On appeal, the defendant claims (1) that the trial court abused its discretion in granting the state's motion to join his case with the case of his codefendant, Gerjuan Rainer Tyus; (2) that he was deprived of his constitutional right to confrontation when the state's firearms examiner was permitted to testify regarding the findings of another firearms examiner, who was deceased and thus unavailable to testify at trial; (3) that he was deprived of a fair trial when he was identified for the first time in court by Cindalee Torres without a prior nonsuggestive identification; and (4) that the court abused its discretion by admitting certain hearsay statements into evidence.[1] We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. In early December, 2006, Tyus was involved in an ongoing dispute with Todd Thomas regarding a piece of jewelry that Thomas' brother had given to Tyus. Thomas demanded that Tyus give him the jewelry, but Tyus refused to do so unless Thomas paid him $10,000.

On December 3, 2006, there was a drive-by shooting near Tyus' residence on Willetts Avenue in New London. In that incident, Thomas, who was a passenger in a white Lexus that was registered to his wife, fired several gunshots at Tyus with a .38 caliber firearm, striking him in the leg and the back. Tyus returned fire at Thomas, firing five gunshots with a nine millimeter firearm. Four .38 caliber cartridge casings and five nine millimeter cartridge casings were recovered from the scene of the shooting on Willetts Avenue. Later that day, while Tyus was at a hospital being treated for his wounds, the defendant, who was a close friend of Tyus, was at the hospital waiting for news of Tyus' condition, and was overheard to say, "we're gonna get them niggas . . . ."

At approximately 7 p.m. on December 22, 2006, the defendant and Tyus went to Boston to visit family and pick up three girls in a silver Chevrolet Impala that Tyus had rented on December 15, 2006. When one of the three girls refused to return to Connecticut with them, the defendant and Tyus returned to Connecticut with the other two girls.

Later that evening, at approximately 11 p.m. on December 22, 2006, Thomas arrived at Ernie's Café on Bank Street in New London. Shortly after midnight on that evening, while Thomas was outside Ernie's smoking a cigarette, he was shot in the head. A light skinned African-American male was observed fleeing from the place where Thomas fell, running first down Bank Street toward the corner of Golden Street, then up

Golden Street to a municipal parking lot, where he entered the passenger's side of a silver car that had been waiting there with its motor running. As soon as the fleeing man entered the waiting vehicle, it sped away. Thomas was transported to Lawrence + Memorial Hospital, where he was pronounced dead on arrival.

Later, at approximately 12:45 a.m., the defendant and Tyus arrived at Bella Notte, a nightclub in Norwich. Tracking information on records produced by their cell service providers established that their three cell phones—Tyus had two cell phones in his possession and the defendant had one—had been brought from Boston to New London at approximately 11:45 p.m. All three phones activated cell towers in New London, in the vicinity of Ernie's, minutes before a 911 call was received reporting the shooting outside of Ernie's. Thereafter, between 12:30 and 12:42 a.m., the three cell phones were taken from New London to Norwich, where they activated a cell tower in close proximity to Bella Notte.[2] A few hours later, at approximately 4 a.m., Tyus dropped the defendant off at the apartment that he shared with his then girlfriend, Ritchae Ebrahimi. After arriving at the apartment, the defendant told Ebrahimi that he had shot someone that night.

One nine millimeter cartridge casing was recovered from the scene of Thomas' December 23, 2006 shooting outside of Ernie's. A comparison of that cartridge casing to the five nine millimeter cartridge casings recovered from the scene of the defendant's December 3, 2006 shooting on Willetts Avenue revealed that all six had been fired from the same firearm.

On November 20, 2012, the defendant and Tyus were both arrested in connection with the shooting death of Thomas on charges of murder in violation of § 53a-54a, and conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. The conspiracy charges against both defendants were later dismissed on the ground that they were barred by the statute of limitations. The state thereafter filed long form informations charging the defendant and Tyus with murder, both as a principal and as an accessory, in violation of General Statutes §§ 53a-8 and 53a-54a (a). The cases were subsequently joined for trial, then tried together before a single jury, which returned guilty verdicts as to both defendants without specifying whether such verdicts were based on principal or accessorial liability. The court sentenced the defendant to a term of sixty years of incarceration. This appeal followed.[3]

I

The defendant first claims that the court abused its discretion in granting the state's motion to join his case with Tyus' case for trial.[4] We disagree.

On April 7, 2015, the state filed a motion, pursuant to Practice Book § 41-19, for joinder of the defendant's

and Tyus' cases for trial. The state argued that joinder of the two cases would promote judicial economy because, as the court ruled, "virtually all of the witnesses [it] would call in [the defendant]'s trial would be called in the trial of [Tyus]," and the physical and scientific evidence that it would seek to introduce in both cases would be identical. The state further argued that the respective defenses of the defendant and Tyus were not antagonistic, and thus that neither would suffer substantial injustice if their cases were tried together.

The defendant objected to the state's motion for joinder on the ground that the defenses of the defendant and Tyus were antagonistic because "there are several statements made by each defendant, each of which in itself could prove harmful to the other defendant at a trial" and that he would "try to throw Mr. Tyus under the rhetorical bus as often as possible . . . ."

On October 6, 2015, the court orally granted the motion, explaining its ruling as follows: "The court finds that joinder of the cases will clearly advance judicial economy in this case. Virtually all of the witnesses called in one trial would be called in the trial of the other. The physical and the scientific evidence would also be virtually identical. Moreover, joinder would not substantially prejudice the rights of the defendants. Based on the court's review of the statements of the defendants as set forth by the state in its memorandum, it appears that the defenses are not irreconcilable or antagonistic. Both have admitted being with the other on the night in question, and the statements of each do not implicate the other." The court thus found that a joint trial would not be unfairly prejudicial, and so it granted the state's motion for joinder.

The defendant claims that the joinder of his case with Tyus' case was substantially prejudicial to him because the jury heard evidence of "the long-established feud and previous incidents of gun violence between Tyus and Thomas," which he claimed "was inadmissible as it pertained to [him] because there was no evidence that the defendant was at all inculpated in either the feud or previous shootings." Because the defendant did not assert these arguments at trial,[5] his claim is not preserved. He nevertheless argues that his claim should be reviewed for plain error.[6]

"It is well established that the plain error doctrine . . . is an extraordinary remedy used by appellate courts to rectify errors committed at trial that, although unpreserved [and nonconstitutional in nature], are of such monumental proportion that they threaten to erode our system of justice and work a serious and manifest injustice on the aggrieved party. [T]he plain error doctrine . . . is not . . . a rule of reviewability. It is a rule of reversibility. That is, it is a doctrine that this court invokes in order to rectify a trial court ruling

that . . . requires reversal of the trial court's judgment . . . for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . Implicit in this very demanding standard is the notion . . . that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review. . . .

"An appellate court addressing a claim of plain error first must determine if the error is indeed plain in the sense that it is patent [or] readily [discernible] on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . .

"[An appellant] cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is *both* so clear *and* so harmful that a failure to reverse the judgment would result in manifest injustice." (Emphasis in original; internal quotation marks omitted.) *Estela* v. *Bristol Hospital, Inc.*, 179 Conn. App. 196, 199–200 n.2, 180 A.3d 595 (2018).

Because this case does not present a truly extraordinary situation in which the alleged error is so obvious that it would affect the fairness and integrity of and public confidence in the judicial proceedings, we decline to afford the defendant relief under the plain error doctrine.

## II

The defendant next claims that the court erred in admitting the testimony of the state's firearms examiner, James Stephenson, because Stephenson's opinions regarding the firearms evidence in this case were assertedly based on the findings and conclusions of the primary examiner of the evidence in this case, Gerald Petillo, who died before trial. The defendant claims that Stephenson did not conduct "his own truly independent evaluation of the evidence," but, rather that he relied on Petillo's findings and conclusions in formulating his conclusions. The defendant argues that because Stephenson's testimony was based on Petillo's findings and conclusions, and Petillo was unavailable for cross-examination, Petillo's findings and conclusions constituted testimonial hearsay, and the admission of evidence on the basis of that hearsay, specifically, Stephenson's testimony, violated his constitutional right to confrontation. We disagree.

In *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the United States Supreme Court held that testimonial hearsay is admissible against a criminal defendant at trial only if the defendant had a prior opportunity for cross-examination and the witness is unavailable to testify at trial. Id., 68. The

United States Supreme Court's subsequent decisions in *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), and *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), extended the holding in *Crawford* to apply the confrontation clause in the specific context of scientific evidence.

In *Melendez-Diaz* the court held that certificates signed and sworn to by state forensics analysts, which set forth laboratory results of drug tests that were done by those analysts and which were admitted into evidence in lieu of live testimony from the analysts themselves, were testimonial within the meaning of *Crawford*, and thus that they were improperly admitted because the defendant did not have an opportunity to cross-examine those analysts. *Melendez-Diaz* v. *Massachusetts*, supra, 557 U.S. 311.

In *Bullcoming*, the court held that the confrontation clause does not permit the prosecution to introduce a forensic laboratory report containing a testimonial statement by an analyst, certifying to the results of a blood alcohol concentration test he performed, through the in-court testimony of another scientist "who did not sign the certification or perform or observe the test reported in the certification." *Bullcoming* v. *New Mexico*, supra, 564 U.S. 652. In short, an accused has the right "to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." Id.

Thus, in *Crawford*, *Melendez-Diaz* and *Bullcoming*, the trial court's violation of the defendant's confrontation rights occurred because it admitted certain inculpatory statements that were testimonial in nature and were made against the defendant by an individual who was not subject to cross-examination. See *State* v. *Buckland*, 313 Conn. 205, 215–16, 96 A.3d 1163 (2014), cert. denied,       U.S.      , 135 S. Ct. 992, 190 L. Ed. 2d 837 (2015). Those circumstances are not present in this case.

Here, the defendant and Tyus filed a joint motion in limine to preclude Stephenson's testimony on the ground that his testimony would not be based on his own independent examination of the firearms evidence in this case, but, rather, would be based on the examination of that evidence by Petillo, who was not available for cross-examination by the defendant, and thus that his constitutional right to confrontation would be violated if Stephenson were permitted to so testify. The court held a hearing outside of the presence of the jury on the defendants' motion to preclude Stephenson's testimony. Stephenson testified that when firearms comparisons are made, the technical reviewer would "go in, using the comparison microscope, look at the comparisons himself to make a determination as to

whether the conclusions were correct that were going to be issued in the report." The technical reviewer would make an independent determination concerning the comparisons that were made. Stephenson acted as the technical reviewer of Petillo's conclusions in this case. In that capacity, Stephenson examined the firearms evidence himself and formulated his own opinions as to the evidence he was examining. In this case, Petillo had performed various tests on the firearms evidence that had been collected, and authored a report containing his findings and analysis. Stephenson physically examined the cartridge cases in this case and in the incident on December 3, 2006. He did not merely verify what Petillo had concluded, but came to his own conclusions on the basis of his examination of the evidence before him.

The trial court concluded that "this case is in stark contrast to [*Melendez-Diaz* and *Bullcoming*]. This is not a situation in which the state attempts to elicit testimony from the deceased examiner. . . . [Stephenson] conducted his own independent examination and reached his own independent conclusions. He is clearly entitled to testify as to those findings because he is available and he made conclusions and he will be cross-examined." On that basis, the court concluded that Stephenson's testimony was admissible. We agree.

Here, the only inculpatory conclusions or statements regarding the firearms evidence that were presented to the jury were made by Stephenson in court. Stephenson did not rely on Petillo's report in formulating his own conclusions, nor was Petillo's report admitted into evidence. Although Stephenson reviewed Petillo's report, he conducted his own physical examination of the evidence in this case and came to his own conclusions, which happened to be consistent with Petillo's conclusions. The defendant cross-examined Stephenson extensively. Because the defendant was afforded a full opportunity to confront Stephenson regarding his examination of, and conclusions regarding, the firearms evidence in this case, his claim that he was denied his constitutional right to confrontation is without merit.

### III

The defendant next claims that he was deprived of a fair trial when he was identified for the first time in court by Cindalee Torres, in the absence of a showing that she previously had made a nonsuggestive out-of-court identification of him. We are not persuaded.

The state called Torres, who is the mother of Tyus' son, to testify in this case. She testified that she received a telephone call on the afternoon of December 3, 2006, telling her that Tyus had been shot. Torres went to Lawrence + Memorial Hospital to see if Tyus was okay, but she was not permitted to see him right away. While she was waiting in the hospital lobby, Torres saw the

defendant, whom she had never seen or met, and heard him say, "we're gonna get them niggas, or, I'm gonna get them niggas." Observing that the defendant was excited and upset, Torres interpreted the defendant's statement to be a vow to get back at the people who had just shot Tyus. She later learned the defendant's identity and identified him at trial as the man she saw and overheard at the hospital.

The defendant claims that the court improperly permitted Torres to make an in-court identification of him in the absence of a showing that she previously had made a nonsuggestive out-of-court identification of him. The defendant did not object to Torres' identification of him at trial, and thus he requests review of this claim under the doctrine set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). As modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), the *Golding* doctrine provides that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 239–40. "The defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. . . . The defendant also bears the responsibility of demonstrating that his claim is indeed a violation of a fundamental constitutional right. . . . Finally, if we are persuaded that the merits of the defendant's claim should be addressed, we will review it and arrive at a conclusion as to whether the alleged constitutional violation . . . exists and whether it . . . deprived the defendant of a fair trial." (Citations omitted.) Id., 240–41.

We find that this claim is reviewable under *Golding* because the record before us is adequate to review it and the claim is of constitutional magnitude. We conclude, however, that the defendant cannot prevail under *Golding* because he is unable to demonstrate that a constitutional violation exists and that it deprived him of a fair trial.

In arguing that his due process rights were violated, the defendant relies on *State* v. *Dickson*, 322 Conn. 410, 426, 141 A.3d 810 (2016), cert. denied, U.S. , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), in which our

Supreme Court held that "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court." The court explained: "[A]ny first time in-court identification by a witness who would have been unable to reliably identify the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation . . . . Although we recognize that, when the witness could have identified the defendant in a nonsuggestive procedure, a first time in-court identification does not constitute an actual violation of due process principles, this court has an obligation to adopt procedures that will eliminate the risk that the defendant will be deprived of a constitutionally protected right by being identified in court by a witness who could not have identified the defendant in a fair proceeding. Indeed, it is well established that courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to prevent the significant risk of a constitutional violation." (Emphasis omitted.) Id., 426 n.11.

Our Supreme Court went on to explain that certain in-court identifications were not subject to the prophylactic rules set forth in *Dickson*. The court stated: "In cases in which there has been no pretrial identification . . . and the state intends to present a first time in-court identification, the state must first request permission to do so from the trial court . . . . The trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue. . . . For example, in cases in which the trial court determines that the only issue in dispute is whether the acts that the defendant admittedly performed constituted a crime, the court should permit a first time in-court identification. In cases in which the defendant concedes that identity or the ability of a particular witness to identify the defendant as the perpetrator is not in dispute, the state may satisfy the prescreening requirement by giving written or oral notice to that effect on the record.

"If the trial court determines that the state will not be allowed to conduct a first time identification in court, the state may request permission to conduct a nonsuggestive identification procedure, namely, at the state's option, an out-of-court lineup or photographic array, and the trial court ordinarily should grant the state's request. . . . If the witness previously has been unable to identify the defendant in a nonsuggestive identification procedure, however, the court should not allow a second nonsuggestive identification procedure unless the state can provide a good reason why a second bite at the apple is warranted. If the eyewitness is able to identify the defendant in a nonsuggestive out-of-court

procedure, the state may then ask the eyewitness to identify the defendant in court. . . .

"If the trial court denies a request for a nonsuggestive procedure, the state declines to conduct one, or the eyewitness is unable to identify the defendant in such a procedure, a one-on-one in-court identification should not be allowed. The prosecutor may still examine the witness, however, about his or her observations of the perpetrator at the time of the crime, but the prosecutor should avoid asking the witness if the defendant resembles the perpetrator." (Citations omitted; footnote omitted.) Id., 445–47. The court clarified that, if a defendant did not dispute a witness' ability to identify him, but merely disputed such witness' testimony on other grounds, the witness would be "properly permitted to make a first time in-court identification of the defendant" without violating due process. Id., 446 n.28.

With respect to the applicability of the procedural rules announced in *Dickson*, our Supreme Court stated that they applied "to the parties to the present case and to all pending cases. It is important to point out, however, that, in pending *appeals* involving this issue, the suggestive in-court identification has already occurred. Accordingly, if the reviewing court concludes that the admission of the identification was harmful, the only remedy that can be provided is a remand to the trial court for the purpose of evaluating the reliability and the admissibility of the in-court identification under the totality of the circumstances . . . . If the trial court concludes that the identification was sufficiently reliable, the trial court may reinstate the conviction, and no new trial would be required." (Citations omitted; emphasis in original; footnote omitted.) Id., 451–52.

Here, although Torres did not identify the defendant as the individual who shot and killed Thomas, the crime with which the defendant was charged and on which he was being tried, she identified him as the person she saw at the hospital on December 3, 2006, and whom she overheard saying, "we're gonna get them niggas, or, I'm gonna get them niggas." Torres believed that the defendant was referring to getting revenge on the ones who had shot Tyus earlier that day. The defendant contends that Torres' identification of him was unreliable because she had never met him or spoken to him before she claimed to have seen him at the hospital on the night of December 3, 2006. The defendant, however, testified that he was in fact present in the hospital lobby on the evening of December 3, 2006, because Tyus, to whom he referred as "his brother," had been shot earlier that day. The defendant was not asked directly whether he made the statement attributed to him by Torres, but he admitted that he had been upset that night and testified: "Everybody's gonna be upset if your family member gets injured; of course you're going to be upset

at that time." Despite the facts that the defendant acknowledged that he was present at the hospital on the night that Tyus was shot, and that he was admittedly upset by the attack on his "brother," there was no showing that Torres had identified him in a nonsuggestive procedure prior to identifying him in court, and, therefore, Torres' identification runs afoul of *Dickson*. We thus turn to an examination of the strength of the state's case against the defendant, in the absence of the allegedly improper identification of him by Torres, to determine if that identification was harmless beyond a reasonable doubt.

It is undisputed that the defendant and Tyus were together on the night that Thomas was shot and killed. Thomas had shot Tyus just three weeks prior to his own death. Even without hearing Torres' account of the defendant's expressed desire to get back at Thomas, the jury could have inferred such an animus based simply on the fact that Thomas had attacked the defendant's close friend and "brother," Tyus. The police spoke to the defendant several times about the December, 2006 incidents prior to his arrest. During one of those discussions, the defendant told the police that he and Tyus went to Boston on the night of December 23, 2006, in a silver Impala that Tyus had previously rented. The state presented evidence that, later that night, a man fitting the defendant's description ran from the scene of Thomas' shooting to a nearby municipal parking lot and got into the passenger's side of a silver vehicle that was there waiting for him. The description of that vehicle matched the Impala that had been previously rented by Tyus. Although the defendant denied, at trial, ever having been in the Impala, his DNA was retrieved from the passenger side of that vehicle.

The state also presented evidence undermining the defendant's alibi. Although the defendant and Tyus insisted that they were at Bella Notte in Norwich when Thomas was shot and killed in New London, the cell phone location data contradicted their claim. According to that data, the defendant's cell phone and Tyus' two cell phones were in New London, where and when Thomas was shot, and then were taken to Norwich thereafter, arriving at Bella Notte at approximately 12:45 a.m. That information is consistent with the testimony of Eduardo Guilbert that the defendant and Tyus did not arrive at Bella Notte that night until after he had received word that Thomas had been shot and killed. A few hours after Thomas was shot and killed, the defendant told Ebrahimi that he had shot someone earlier that morning.

The firearms evidence presented by the state showed that the gun that Tyus used to fire back at Thomas on December 3, 2006, was the same weapon used to shoot and kill Thomas just three weeks later. On the basis of the defendants' insistence that they were together on

the night Thomas was shot and killed, the jury could have inferred that the defendant was involved, as either the principal or an accessory, in the shooting death of Thomas.

In light of our review of the entire record, including the strength of the state's case against the defendant, without the evidence of Torres' in-court identification of the defendant, and the trial court's detailed instruction to the jury as to how it should weigh the identification evidence, we conclude that the admission of that identification into evidence was harmless beyond a reasonable doubt, and thus that the defendant's claim fails under the fourth prong of *Golding*.[7]

## IV

The defendant next claims that the court erred in admitting into evidence certain hearsay statements by two of the state's witnesses. "A trial court's decision to admit evidence, if premised on a correct view of the law . . . calls for the abuse of discretion standard of review. . . . In other words, only after a trial court has made the legal determination that a particular statement is or is not hearsay, or is subject to a hearsay exception, is it vested with the discretion to admit or to bar the evidence based upon relevancy, prejudice, or other legally appropriate grounds related to the rule of evidence under which admission is being sought." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Midland Funding, LLC* v. *Mitchell-James*, 163 Conn. App. 648, 653, 137 A.3d 1 (2016). With this in mind, we address the defendant's hearsay claims in turn.

## A

The defendant first challenges the propriety of the admission into evidence of the testimony of Guilbert, who was called to testify by the state. Guilbert testified that, on the night of December 22, 2006, he had been at Bella Notte. At some point that night, Guilbert received a phone call from Charlene Thomas.[8] When the state asked Guilbert what Charlene Thomas told him during that phone call, counsel for the defendant objected. Although the basis for the objection was not stated, the state told the court: "I'm going to claim it on the effect of the hear—and will explain what Mr. Guilbert then did." The court ruled: "Given that claim, I'm going to overrule the objections and allow the testimony." Guilbert then testified that Charlene Thomas told him that Todd Thomas, Guilbert's childhood friend, had just been shot. Charlene Thomas suggested that Guilbert call Todd Thomas' wife if he knew her phone number. Guilbert called Todd Thomas' wife and told her to get to the hospital. Approximately fifteen or twenty minutes after Guilbert made that phone call, he saw the defendant enter Bella Notte with another man. He had not seen them at Bella Notte before that time. The

defendant greeted Guilbert and offered to buy him a drink. Guilbert declined because he was getting ready to leave. Upon finishing his drink, Guilbert left Bella Notte and drove to Lawrence + Memorial Hospital, where he paid his respects to Todd Thomas' family, and then left.

On appeal, the defendant claims that he objected at trial on the ground that Guilbert's testimony as to what Charlene Thomas told him over the phone on the night in question was hearsay, and that "her testimony was admitted specifically for the truth of Charlene Thomas' statement as a means to discredit the defendants' alibis and not to show its effect on Guilbert . . . ." In other words, Guilbert's testimony proved that the defendant and Tyus did not arrive at Bella Notte until after Thomas was shot. Although the defendant objected to Guilbert's testimony as to what he was told during the phone call that he allegedly received before the defendant and Tyus arrived at Bella Notte, he did not state the basis for that objection. "[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of an objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Bell*, 113 Conn. App. 25, 40, 964 A.2d 568, cert. denied, 291 Conn. 914, 969 A.2d 175 (2009).

Here, the defendant's bald objection to Guilbert's testimony, absent any articulation of the basis for his objection, was insufficient to preserve his claim for review. We thus decline to review it.

B

The defendant also claims that the court erred in admitting into evidence the testimony of Ebrahimi's mother, Robin Deetz, as a prior consistent statement. We disagree.

During the defendants' cross-examination of Ebrahimi, she testified that she did not tell the police detectives that the defendant told her during the early morning hours of December 23, 2006, that he had shot

someone earlier that night until they threatened her with imprisonment or the removal of her children from her care. In eliciting that testimony, the defendant suggested that Ebrahimi's disclosure of the defendant's alleged confession to her was coerced, and therefore fabricated.

After Ebrahimi testified, the state called Deetz to the witness stand. The state asked Deetz about a conversation she had had with Ebrahimi at the end of 2006, and asked if Ebrahimi ever "relay[ed] to you any information concerning [the defendant] making a statement about somebody being shot." The defendant then objected to the state's next question, which asked Deetz what Ebrahimi had told her in the earlier conversation, on the ground that Deetz' response would be hearsay. The state argued that it was not offering the testimony for the truth of the matter asserted, but, rather, "as a prior consistent statement to rehabilitate a witness after there's been a claim of recent fabrication." The court overruled the defendant's objection, and Deetz responded that Ebrahimi "was a mess" at the end of 2006 because Armadore had shot someone. Neither the defendant nor Tyus cross-examined Deetz.

On appeal, the defendant claims that the court erred in admitting Deetz' testimony into evidence on the ground that it constituted a prior consistent statement.

"Prior consistent statements of a witness are generally regarded as hearsay and are not admissible at trial, either for their truth or for the purpose of rehabilitating a witness' damaged credibility. . . . This rule, however, is not absolute. The trial court, within its discretion, may admit a prior consistent statement if offered to rehabilitate a witness who has been impeached . . . by a claim of recent fabrication . . . . When a prior consistent statement is admitted under [that exception], it is admitted to affect credibility only and not to establish the truth of the statement."[9] (Citations omitted; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 803–804, 709 A.2d 522 (1998).

Here, the state offered Deetz' testimony, and the court admitted that testimony, as a prior consistent statement to rebut the defendant's suggestion that Ebrahimi fabricated the defendant's alleged confession to her because she was threatened by the police. The defendant claims that Deetz' testimony was not consistent with Ebrahimi's because "Deetz testified to a conclusion apparently reached by her daughter that the defendant had shot someone," whereas Ebrahimi testified that the defendant *told her* that he had shot someone. The defendant argues that "there is no context to the comment and no indication of what caused Ebrahimi to reach [the] conclusion" to which Deetz testified—that the defendant had shot someone. In so arguing, the defendant ignores the question that immediately preceded the challenged portion of Deetz' testimony, which pro-

vides the context that the defendant claims to be missing. The state asked Deetz: "[W]hat did [Ebrahimi] tell you that [the defendant] had told her?" The defendant's argument that Deetz' testimony was not consistent with Ebrahimi's due to a lack of context is without merit, and, therefore, his claim that the court erred in admitting it as a prior consistent statement must fail.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant also claims that the court erred when it admitted testimony and documentary evidence of cell phone data, absent any objection by the defendant or Tyus, without qualifying the witness as an expert or holding a hearing pursuant to *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), to determine its reliability. Because this claim is evidentiary in nature, and the defendant failed to preserve it at trial, we decline to review it. See *State* v. *Turner*, 181 Conn. App. 535, 549–55, 187 A.3d 454, cert. granted on other grounds, 330 Conn. 909,    A.3d    (2018).

[2] The defendant and Tyus claimed that they had been at Bella Notte when Thomas was shot and killed in New London.

[3] Tyus also challenged his conviction. We addressed Tyus' appeal in a separate opinion. See *State* v. *Tyus*, 184 Conn. App. 669,    A.3d    (2018).

[4] The defendant also claims that the court erred in failing to sever the two cases as the trial progressed and that the spillover effect of the evidence clearly prejudiced the defendant. The defendant did not object to any of the evidence that he now claims prejudiced him, nor did he request a limiting instruction regarding that evidence. His claim in this regard is therefore not preserved and we decline to review it.

[5] In fact, contrary to his argument opposing joinder, the defendant did not point the finger at Tyus as being the perpetrator of the crime for which they were both on trial. As noted herein, they both maintained that they were together at Bella Notte in Norwich when Thomas was shot and killed in New London.

[6] It is noteworthy that the defendant did not object to the admission of the evidence of the feud and the December 3, 2006 shooting.

[7] The defendant claims that the admission of Torres' in-court identification of him violated his right to due process under both the federal and state constitutions. In the recently released decision in *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018), our Supreme Court held that our state constitution affords greater protection than the federal constitution with respect to the admissibility of eyewitness identifications. Because we conclude that the identification of the defendant by Torres should have been excluded, but that the admission of that identification was harmless, our analysis of the defendant's claim is not impacted by *Harris*.

[8] Charlene Thomas is not related to Todd Thomas.

[9] We note that the court correctly instructed the jury on the limited purpose of a prior consistent statement. That instruction has not been challenged on appeal.