******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* GERJUAN
RAINER TYUS
(SC 20462)

Robinson, C. J., and McDonald, D'Auria,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of
the victim, the defendant appealed. Prior to the shooting, the defendant
was involved in a dispute with the victim, after which the victim drove
by the defendant's apartment and shot the defendant, and the defendant
fired back at the victim. The defendant's close friend, A, thereafter stated
an intention to seek revenge against the victim. Approximately two
weeks later, the victim was shot and killed at a café in New London.
In an interview with the police after the victim's murder, the defendant
told them that, on the night of the victim's murder, he and A had traveled
directly from Boston to a nightclub in Norwich located approximately
twelve miles away from the café, thereby indicating that he and A were
not present at the café at the time of the murder. The defendant and
A were subsequently charged with murder and conspiracy to commit
murder, but the conspiracy charges were dismissed prior to trial. The
trial court granted the state's motion to join the cases against the defen-
dant and A for trial. At trial, A's girlfriend, E, testified that A told her
that he had shot someone on the night the victim was killed. Bullet
casings from the scene of the shooting at the defendant's apartment and
from the murder scene were submitted to the state forensic laboratory.
A ballistics analyst, P, examined the evidence and generated a written
report containing his findings. S, who also was employed at the labora-
tory, served as a technical reviewer of P's report. P died before trial
and was therefore unavailable to testify. The state subsequently sought
to admit testimony from S, and the court denied the defendant's motion
to preclude S's testimony. The jury found the defendant guilty of murder
as a principal or an accessory. The Appellate Court affirmed the defen-
dant's conviction, and the defendant, on the granting of certification,
appealed to this court. *Held*:

1. The Appellate Court correctly concluded that the trial court had not
   abused its discretion in joining the defendant's case with A's case for
   trial: the state's case against the defendant and the state's case against
   A both arose from the shooting death of the victim, most of the state's
   evidence would have been admissible against both the defendant and
   A if their cases had been tried separately, and the defendant's and
   A's defenses were not antagonistic because each served as the other's
   principal alibi witness, the defendant and A both having claimed that
   they were together at a certain nightclub at the time of the shooting;
   moreover, the defendant could not prevail on his claim that joinder was
   improper on the ground that E's testimony regarding A's admission that
   he had shot someone on the night of the victim's murder could not have
   been admitted into evidence against the defendant under the coconspira-
   tor exception to the hearsay rule, because, contrary to the defendant's
   claim, that hearsay exception is applicable even in cases, such as the
   present one, in which the defendant is not facing a conspiracy charge
   at the time of trial.

2. The defendant could not prevail on his unpreserved claim that the admis-
   sion into evidence of certain information regarding the location of his
   cell phone (CSLI) around the time of the victim's murder violated his
   fourth amendment rights insofar as the police obtained that information
   without a warrant: the admission of the defendant's CSLI was harmless
   because evidence other than the defendant's CSLI placed the defendant
   close to the crime scene at the time of the victim's murder, including
   CSLI from the cell phone of A, who maintained at trial that he and the
   defendant were together the entire evening, and there was additional
   evidence from which the jury could have inferred that the defendant
   and A had lied about being at the Norwich nightclub at the time of the
   murder, including testimony from a witness that he saw the defendant

and a man matching A's description entering that nightclub fifteen to twenty minutes after the witness was told that the victim had been shot; moreover, there was evidence that the defendant and A were driving in a rented silver vehicle on the night of the murder, and witnesses testified that a man matching A's description ran from the scene of the shooting and entered a vehicle matching the description of the rented vehicle, the defendant's and A's DNA were found in that vehicle, and a substance found in the interior of that vehicle possessed genetic characteristics similar to those of the victim.

3. Although the Appellate Court incorrectly concluded that the defendant's right to confrontation was not violated when the trial court allowed S, an employee of the state forensic laboratory to testify about certain findings made by P, a ballistics analyst with the same laboratory who was unavailable to testify at the defendant's trial, the admission of S's testimony was harmless beyond a reasonable doubt:

a. The defendant's constitutional right to confrontation was violated when the trial court allowed S to testify about certain of P's findings regarding the ballistics evidence in the case, the defendant having been deprived of the opportunity to cross-examine P with respect those findings; although S was asked about his own analysis and conclusions in connection with his independent review of the ballistics evidence, S was also asked during direct examination about certain evidence that P had reviewed, and about which P had made findings, but that S had no recollection of reviewing himself, and, because, in those instances, S relied solely on P's findings rather than his own, the state indirectly communicated P's findings to the jury through S's testimony.

b. The admission of S's testimony about P's findings was harmless beyond a reasonable doubt, as S's testimony was cumulative of other evidence, including S's testimony regarding his analysis and conclusions based on his independent review of the evidence, from which the jury reasonably could have concluded that the firearm that the defendant used to fire back at the victim at the defendant's apartment was the same weapon that was used to kill the victim; moreover, other evidence presented at trial provided the jury with a strong evidentiary basis to conclude that the defendant had ready access to the type of firearm that was used to murder the victim, and there was other compelling evidence of the defendant's guilt, including DNA evidence, motive, and evidence that placed the defendant close to the café at the time of the victim's murder.

Argued October 14, 2021—officially released April 12, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of murder and conspiracy to commit murder, brought to the Superior Court in the judicial district of New London, where the court, *Jongbloed, J.*, granted the defendant's motion to dismiss the charge of conspiracy to commit murder and granted the state's motion to consolidate for trial the defendant's case with that of a codefendant; thereafter, the case was tried to the jury before *A. Hadden, J.*; subsequently, the court, *A. Hadden, J.*, denied the defendant's motion to preclude certain evidence; verdict and judgment of guilty, from which the defendant appealed to this court; thereafter, the case was transferred to the Appellate Court, *Lavine, Sheldon* and *Harper, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Pamela S. Nagy*, supervisory assistant public defender, for the appellant (defendant).

*James A. Killen*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, former state's attorney, and *Paul J. Narducci*, state's attorney, for the appellee (state).

*Charles D. Ray*, *Dana M. Delger*, pro hac vice, *M. Christopher Fabricant*, pro hac vice, *Don O. Burley*, pro hac vice, *Barbara E. Butterworth*, pro hac vice, *Jessica L. Hannah*, pro hac vice, and *Alexander E. Harding*, pro hac vice, filed a brief for the Innocence Project, Inc., as amicus curiae.

*Opinion*

KAHN, J. The defendant, Gerjuan Rainer Tyus, appeals from the judgment of the Appellate Court, which affirmed his conviction of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8. In this appeal, the defendant claims that (1) the Appellate Court incorrectly concluded that the trial court had not abused its discretion in joining the defendant's case with that of his codefendant, Darius Armadore, because the evidence in both cases was cross admissible, (2) his fourth amendment rights were violated under *Carpenter* v. *United States*,     U.S.    , 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018), when the police obtained his cell site location information (CSLI) without a warrant supported by probable cause, and (3) the Appellate Court incorrectly concluded that the defendant's right to confrontation was not violated when the trial court allowed a state's firearms examiner to testify about the findings of a second firearms examiner, who was deceased and, thus, unavailable to testify at trial. The state disagrees with each of these claims and asserts, in the alternative, that any error was harmless. For the reasons that follow, we agree that the Appellate Court correctly concluded that the trial court had not abused its discretion in joining the defendant's case with the codefendant's case and that the violations of the defendant's constitutional rights were harmless beyond a reasonable doubt. Accordingly, we affirm the judgment of the Appellate Court.

The following facts, which the jury reasonably could have found from the evidence admitted at trial, and procedural history are relevant to our review of the defendant's claims. In December, 2006, the defendant was involved in an ongoing dispute with the victim, Todd Thomas, over jewelry that the victim's brother had given to the defendant. The victim demanded that the defendant return the jewelry, but the defendant refused to do so unless the victim paid him $10,000.

The victim's girlfriend, Devena Colebut, told the police that, after the victim had requested that the jewelry be returned, she and the victim were driving in the victim's white Lexus in New London. She recognized the defendant's vehicle, a blue Range Rover, which began to follow the Lexus. Soon after, she heard three or four gunshots, and the victim pushed her down. The victim made several turns in an attempt to evade the Range Rover.[1]

On December 3, 2006, the victim drove by the defendant's apartment on Willetts Avenue in New London as a passenger in the white Lexus, which was registered to his wife. The victim fired several gunshots from a .38 caliber firearm, striking the defendant in the leg and the back. The defendant fired gunshots back at the victim with a nine millimeter firearm. The defendant's acquaintance, Rashard Johnson, who was present at the

scene of that shooting, told the police that the defendant had a gun that he thought might be a nine millimeter firearm. Five nine millimeter cartridge casings were subsequently recovered from the scene of the shooting on Willetts Avenue. Those casings were found in front of 28 Willetts Avenue, the very same location the defendant later identified to the police on a hand drawn map as the place he had been standing. Several casings from a .38 caliber firearm were found farther down the street, in front of 24 Willetts Avenue from the location where the victim had fired. Later that same day, while the defendant was being treated for his wounds at the hospital, his close friend, Armadore, visited the defendant at the hospital and was overheard to say, "we're gonna get them niggas  .  .  .  ."[2]

On December 15, 2006, the defendant's then girlfriend, Takeisha Betts, went with the defendant to rent a silver Chevrolet Impala and listed herself and the defendant as authorized drivers of that vehicle.[3] The defendant and Armadore drove this rental vehicle to Boston, Massachusetts, at approximately 7 p.m. on December 22, 2006. While in Boston, the defendant and Armadore visited family and then picked up three women. One of the women subsequently refused to return to Connecticut with them, so the defendant and Armadore drove the other two women back to Connecticut in the silver Impala.

That evening, the victim was at Ernie's Café on Bank Street in New London. Kevin Thorne, an acquaintance of the defendant, testified that he was at Ernie's Café around that time and that, while he was there, he and the defendant communicated several times over their cell phones in order to arrange a marijuana sale. Shortly after midnight, the victim was shot in the head while he was standing outside of the front entrance of Ernie's Café smoking a cigarette. Thorne was outside of the bar and near the victim at the time of the shooting, and his phone records show that he was on the phone with the defendant around that time.

Witnesses observed a light-skinned African American male wearing a hooded sweatshirt fleeing the scene of the crime toward a municipal parking lot on Golden Street, where he entered the passenger side of a silver vehicle that was waiting there with its motor running. The vehicle immediately sped away. The victim was transferred to Lawrence + Memorial Hospital in New London and was pronounced dead upon arrival.

After the shooting, the defendant and Armadore arrived at Bella Notte, a nightclub in Norwich located approximately twelve and one-half miles north of Ernie's Café. The defendant elected to testify at trial and asserted that he and Armadore had driven straight from Boston to Bella Notte, and that they were there at the time the victim was shot. However, CSLI from two cell phones belonging to the defendant and one cell phone belong-

ing to Armadore showed that they were in New London at the time of the victim's death. Further, a state's witness, Eduardo Guilbert, testified that he saw the defendant and a man matching Armadore's description entering Bella Notte sometime after Guilbert received a phone call informing him that the victim had been shot.[4]

A few hours later, the defendant dropped Armadore off at the apartment Armadore shared with his then girlfriend, Ritchae Ebrahimi. At trial, Ebrahimi testified that, after Armadore arrived at their home, they argued over his having been with other women that evening, and that he told her he had shot someone that night.

The police recovered one nine millimeter cartridge casing from the scene of the December 23, 2006 shooting at Ernie's Café. Ballistics evidence showed that this cartridge casing had been fired from the same firearm as all five of the nine millimeter cartridge casings that were recovered in front of 28 Willetts Avenue at the scene of the December 3, 2006 shooting.

The police also recovered the silver Impala that the defendant and his girlfriend rented, after it was returned to a rental car company in New London. The police then searched that vehicle for evidence related to the shooting. In addition to both the defendant's and Armadore's DNA, a red, bloodlike substance found on the interior of the Impala's front passenger door possessed genetic characteristics similar to that of the victim's. Angela Przech, an employee at the state forensics laboratory, noted that a bloodlike substance, although not blood, could be skin cells, saliva, sweat, or brain tissue.

Both the defendant and Armadore were interviewed by the police relating to their whereabouts during the night of and at the time of the shooting. During his initial interview with the police, the defendant stated that he and Armadore arrived at Bella Notte before 11:30 p.m. and that he did not see anyone he knew at Bella Notte. In a subsequent interview, however, the defendant said that he recognized a female friend at Bella Notte. Further, during an interview with the police shortly after the shooting, the defendant stated that he and Armadore had driven to Boston in a black car, but, after returning to Connecticut, they exchanged it for a rented silver car. In his March, 2008 interview with the police, the defendant stated that he and Armadore drove to Boston in a rental car. During his interview with the police in December, 2006, Armadore stated that he and the defendant traveled to Boston in a silver Impala to visit family. Both the defendant and Armadore testified at trial that they did not recall telling the police that they had ridden in a silver Impala that evening. Specifically, Armadore denied telling the police that he ever had ridden in a silver Impala with the defendant on the evening in question. The jury, however, was presented with forensic evidence showing that both Armadore and the defendant had been inside of the silver Impala

rented by the defendant and his girlfriend. Throughout the investigation and even during their trial testimony, both the defendant and Armadore maintained that they were together at all times that evening and night.

On November 20, 2012, the defendant and Armadore were arrested and charged with murder in violation of § 53a-54a and conspiracy to commit murder in violation of § 53a-54a and General Statutes § 53a-48. The conspiracy charges were later dismissed as to both defendants on the ground that they were barred by the statute of limitations. The state then filed long form informations charging the defendant and Armadore with murder, both as a principal and as an accessory, in violation of §§ 53a-54a (a) and 53a-8.

The state subsequently filed a motion to join for trial the cases against the defendant and Armadore. The trial court granted that motion, over the objections of counsel, and the case was tried before a single jury, which returned guilty verdicts as to both the defendant and Armadore.[5] The court sentenced the defendant to a term of fifty-five years of incarceration.

The defendant appealed from the judgment of conviction to this court, which transferred the appeal to the Appellate Court.[6] Before the Appellate Court, the defendant claimed "(1) that the trial court abused its discretion in granting the state's motion to join his case for trial with that of . . . Armadore; (2) that he was deprived of his constitutional right to confrontation when the state's firearms examiner was permitted to testify regarding the findings of another firearms examiner, who was deceased, and thus unable to testify at trial; and (3) that the court erred in denying his request for a limiting instruction to the jury concerning the testimony of the state's firearms examiner." *State* v. *Tyus*, 184 Conn. App. 669, 670–71, 195 A.3d 737 (2018). The Appellate Court disagreed with those claims and, accordingly, affirmed the trial court's judgment of conviction. Id., 685. This certified appeal followed. See *State* v. *Tyus*, 335 Conn. 907, 227 A.3d 77 (2020). Additional facts and procedural history are set forth subsequently in this opinion as necessary.

The present appeal presents three certified questions: (1) whether the Appellate Court correctly concluded that the trial court had not abused its discretion in joining the defendant's case with that of Armadore because the evidence in both cases was cross admissible; (2) whether, in light of the United States Supreme Court's recent decision in *Carpenter*, the defendant's fourth amendment rights were violated when the police obtained his historical CSLI without a warrant; and (3) whether the Appellate Court correctly concluded that the defendant's right to confrontation was not violated when the trial court allowed a substitute firearms examiner to testify about the findings of the primary examiner, who was unable to testify at trial.[7] We address these three

claims in turn.

I

The defendant first claims that the Appellate Court incorrectly concluded that the trial court had not abused its discretion in joining the defendant's case with that of Armadore's case because the evidence in both cases was cross admissible.[8] We disagree.

The following additional facts and procedural history are relevant to our consideration of this claim. Before trial, the state filed a motion for joinder of the defendant's case with Armadore's for trial pursuant to Practice Book § 41-19. The state argued that joining the cases would promote judicial economy because the witnesses, physical evidence, and scientific evidence presented for each case would be identical. The state also argued that the defendant's and Armadore's defenses would not be antagonistic, and, therefore, neither would suffer substantial injustice by having their cases tried together.

In an objection to the state's motion for joinder, defense counsel argued that the defendant would be substantially prejudiced by joining his case with Armadore's because Ebrahimi's testimony that Armadore told her he had shot someone on December 23, 2006, would constitute inadmissible hearsay against him. Specifically, counsel argued that the only way the state could introduce Armadore's confession against the defendant would be pursuant to the coconspirator exception to the hearsay rule but that this exception would not apply because the conspiracy charge against the defendant had been dismissed. The trial court heard argument on the motion for joinder and orally granted that motion, finding that a joint trial would not be unfairly prejudicial to either the defendant or to Armadore.

On appeal, the defendant renews his claim that the joinder of his case with Armadore's case was improper because Armadore's confession to his girlfriend was not admissible against him under the coconspirator exception to the hearsay rule because the conspiracy charges against him had been dismissed. He, thus, argues that its introduction and use in his joint trial with Armadore resulted in unfair prejudice. The Appellate Court rejected this claim, reasoning that it was based on the erroneous legal premise that a coconspirator's statements are only admissible in criminal cases involving conspiracy charges. *State* v. *Tyus*, supra, 184 Conn. App. 678–79. The Appellate Court concluded that, because the defendant provided no other basis for the objection to the joinder, the trial court did not err in joining the cases for trial. Id., 679. We agree with the well reasoned decision of the Appellate Court on this particular point and are, thus, unpersuaded by the defendant's claim.

As the Appellate Court aptly noted, Practice Book

§ 41-19 provides that "[t]he judicial authority may, upon its own motion or the motion of any party, order that two or more informations, whether against the same defendant or different defendants, be tried together." This court has observed that "[t]he argument for joinder is most persuasive when the offenses are based [on] the same act or criminal transaction, since it seems unduly inefficient to require the state to resolve the same issues at numerous trials. . . . In contrast, when the cases are not of the same character, the argument for joinder is far less compelling because the state must prove each offense with separate evidence and witnesses [thus] eliminat[ing] any real savings in time or efficiency which might otherwise be provided by a single trial." (Internal quotation marks omitted.) *State* v. *LaFleur*, 307 Conn. 115, 157, 51 A.3d 1048 (2012). Further, "[a] joint trial expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden [on] citizens who must sacrifice both time and money to serve [on] juries, and avoids the necessity of recalling witnesses who would otherwise be called to testify only once." (Internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 622, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

Although joint trials may serve to conserve judicial resources, we note that trials may not be joined if a "substantial injustice is likely to result unless a separate trial be accorded." *State* v. *White*, 229 Conn. 125, 158, 640 A.2d 572 (1994). "A separate trial will be ordered [when] the defenses of the accused are antagonistic, or evidence will be introduced against one which will not be admissible against others, and it clearly appears that a joint trial will probably be prejudicial to the rights of one or more of the accused." (Internal quotation marks omitted.) *State* v. *Booth*, supra, 250 Conn. 620. We also note that "[t]he phrase prejudicial to the rights of the [accused] means something more than that a joint trial will probably be less advantageous to the accused than separate trials." (Internal quotation marks omitted.) Id.

Further, "we will reverse a trial court's ruling on joinder only [when] the trial court commits an abuse of discretion that results in manifest prejudice to one or more of the defendants." *State* v. *Vinal*, 198 Conn. 644, 649, 504 A.2d 1364 (1986). "[I]t is the defendant's burden on appeal to show that joinder was improper by proving substantial prejudice that could not be cured by the trial court's instructions to the jury . . . . [I]n deciding whether to [join informations] for trial, the trial court enjoys broad discretion, which, in the absence of manifest abuse, an appellate court may not disturb." (Citation omitted; internal quotation marks omitted.) *State* v. *Devon D.*, 321 Conn. 656, 665, 138 A.3d 849 (2016).

In the present case, the state's case against the defendant arose from the same criminal incident as its case against Armadore, namely, the shooting death of the victim. Further, at the time of the trial, most of the state's evidence would have been admissible against both the defendant and Armadore had their cases been tried separately. Finally, the defendant's and Armadore's defenses to the charges were not antagonistic. Indeed, each served as the other's principal alibi witness, as both claimed that they were together at Bella Notte at the time of the shooting.

Defense counsel's only opposition to joinder before the trial court, and the basis for the defendant's related claim of error before the Appellate Court and in the present appeal, is that Armadore's confession that he shot someone could only have been admitted into evidence against the defendant under the coconspirator exception to the hearsay rule if he was facing a conspiracy charge. Counsel claimed that this exception could not possibly apply in the defendant's case because the conspiracy charges against both him and Armadore were barred by the statute of limitations. The defendant's argument, in fact, assumed that Armadore's confession would have been admitted against the defendant under the coconspirator exception to the hearsay rule had his conspiracy charge remained pending.[9] Defense counsel asserted no other evidentiary or other basis for excluding Armadore's confession, and counsel neither objected to Ebrahimi's testimony regarding Armadore's confession at trial nor requested the issuance of a limiting instruction to the jury.

Thus, the defendant's argument that joinder was improper rests squarely on his contention that the absence of a conspiracy charge made Ebrahimi's testimony about Armadore's confession inadmissible against him. As the Appellate Court correctly concluded, this argument must fail as a matter of law. *State* v. *Tyus*, supra, 184 Conn. App. 678–79. Section 8-3 of the 2009 edition of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"(1) Statement by a party opponent. A statement that is being offered against a party and is . . . (D) a statement by a coconspirator of a party while the conspiracy is ongoing and in furtherance of the conspiracy . . . ." (Emphasis omitted.)

We agree with the Appellate Court that neither the plain language of this rule, nor the common law it is based on, limits the application of the exception only to criminal cases involving charges of conspiracy. See Conn. Code Evid. (2009) § 8-3 (1), commentary ("[t]he [hearsay exception for statements of coconspirators] is applicable in civil and criminal cases alike"); see also

*State* v. *Marion*, 175 Conn. 211, 219–20 n.8, 397 A.2d 533 (1978) (noting that application of coconspirator exception to hearsay rule requires prima facie showing of existence of conspiracy); *Cooke* v. *Weed*, 90 Conn. 544, 550, 97 A. 765 (1916) (noting that statement made by alleged coconspirator of defendant was "admissible under the [well settled] rule relating to the declarations of coconspirators" in civil trial for damages when defendant had not been charged with conspiracy). Because this was the defendant's only basis before the trial court for claiming that his case should not have been joined with Armadore's for trial, we conclude that the Appellate Court did not err in determining that the trial court's joinder of the defendant's and Armadore's cases was proper.

## II

We now turn to the first of the defendant's constitutional claims. The defendant claims that his constitutional rights were violated when the police obtained three days of his CSLI without a warrant. The state responds by arguing that the admission of the defendant's CSLI into evidence was not error, but, if it was, that error was harmless. Because we ultimately agree with the state that the admission of the CSLI was harmless beyond a reasonable doubt, we need not decide whether it was an error.

The defendant claims for the first time[10] that, in light of the United States Supreme Court's recent decision in *Carpenter*, his fourth amendment rights were violated when the police obtained three days of his CSLI without a warrant. *Carpenter* held that, under the fourth amendment to the United States constitution, "the [g]overnment must generally obtain a warrant supported by probable cause" before acquiring CSLI; *Carpenter* v. *United States*, supra, 138 S. Ct. 2221; because individuals maintain "a legitimate expectation of privacy in the record[s] of [their] physical movements as captured through CSLI." Id., 2217. The defendant thus argues that his constitutional rights were violated when the police obtained his CSLI without a warrant. The state argues that *Carpenter* did not conclude whether CSLI collection of less than seven days without a warrant constitutes a search, and, therefore, because only three days of CSLI were obtained in the present case, the defendant's rights were not violated.

Additional facts and procedural history are required to resolve this claim. Approximately two weeks after the victim's murder, Detective Franklin S. Jarvis of the New London Police Department filed ex parte orders, pursuant to General Statutes (Rev. to 2007) § 54-47aa (b), to compel the disclosure of historical CSLI for two cell phones belonging to the defendant, and one belonging to Armadore from the day of the murder to the day after the murder. At the time, § 54-47aa (b) required only "a reasonable and articulable suspicion that a crime

has been or is being committed" to obtain such historical CSLI. The orders were subsequently granted and the records were submitted to Detective Richard Curcuro of the New London Police Department. Those records were then sent to James J. Wines, an agent with the Federal Bureau of Investigation's cellular analysis survey team, who analyzed the CSLI and prepared a slideshow presentation with his analysis. Neither defense counsel nor Armadore's counsel sought to suppress Wines' expert testimony or his slideshow containing the CSLI, which were admitted without objection.[11]

Because the CSLI evidence provided a comprehensive chronicle of the cell phone users' past physical movements, the data showed that all three phones activated cell towers in New London between approximately 12:04 and 12:15 a.m., within minutes of when a 911 call was received at 12:09 a.m., reporting the shooting of the victim. Specifically, both of the defendant's phones activated cell sites west of the Thames River in New London, approximately 0.4 miles from Ernie's Café, between 12:04 a.m. and 12:13 a.m. Armadore's phone activated a cell site east of the Thames River, approximately three miles from Ernie's Café, at 12:15 a.m. The evidence also showed that the cell phones activated cell towers north of New London from approximately 12:42 to 12:44 a.m., and activated a cell tower farther north near Bella Notte, between approximately 1:12 and 1:55 a.m.

Because the defendant's claim related to the admission of CSLI is unpreserved, we look to the familiar test set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). In order for a defendant to prevail under that test, he or she must show that "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 239–40; see *In re Yasiel R.*, supra, 781 (modifying third prong of *Golding*). "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 360, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Even if we assume, without deciding, that the defendant's *Carpenter* claim is reviewable under the first two prongs of *Golding* and that a constitutional violation existed under the third prong,[12] it fails under the fourth

prong. For the reasons set forth subsequently in this opinion, we conclude that the state has sustained its burden of demonstrating that any claimed error by the trial court in admitting the CSLI evidence was harmless beyond a reasonable doubt. See *State* v. *Armadore*, 338 Conn. 407, 437, 258 A.3d 601 (2021) ("[i]t is well settled that constitutional search and seizure violations are not structural improprieties requiring reversal, but rather, are subject to harmless error analysis" (internal quotation marks omitted)). As a result, the defendant's constitutional claim related to the admission of his CLSI data must fail.

We begin with the applicable standard of review. "Whether any error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless [beyond a reasonable doubt]." (Internal quotation marks omitted.) Id. Thus, we begin our analysis of that question by placing those pieces of evidence in the context of the other evidence admitted at trial.

First, even without the evidence of the defendant's historical CSLI, there was other compelling evidence admitted at trial that placed the defendant close to the scene of the crime at the time of the shooting. The historical CSLI from Armadore's cell phone was admitted into evidence and was relied on by Wines, who testified that this cell phone was located in New London, approximately three miles from Ernie's Café, minutes after the 911 call was received that reported the shooting. See id., 438–47 (holding that criminal defendant does not have privacy right in his codefendant's CSLI, and, thus, does not have standing to challenge admission of that evidence). Armadore specifically testified at trial that he had this cell phone with him throughout the night of the shooting and that he was receiving calls on it. Both the defendant and Armadore readily admitted to the police, and, indeed, even maintained at trial, that they were together on the night the victim was shot and killed. The confluence of these two pieces of evidence constitutes highly persuasive proof that puts the defendant precisely where he claimed not to be at the time of the shooting, namely, in the city of New London. This evidence directly and categorically contradicts the defendant's assertion that both he and Armadore drove directly from Boston to Bella Notte on the night of the murder.

Even without CSLI, there was additional evidence presented from which the jury could have reasonably inferred that the defendant and Armadore had lied about being at Bella Notte when the shooting occurred, further strengthening the state's case. As stated previously in this opinion, Guilbert testified at trial that he had witnessed the defendant and a man matching Armadore's description enter Bella Notte approximately fifteen to twenty minutes after Guilbert received a phone call informing him that the victim had been shot. Thus, records of the defendant's historical CSLI were cumulative of other evidence showing that the defendant was not at Bella Notte at the time of the shooting, as he claimed.

Still other circumstantial evidence indicative of the defendant's guilt was presented by the state at trial. There was evidence that the defendant and Armadore went to Boston on the night of the shooting in a rented silver Impala. Multiple witnesses testified that, immediately after the shooting, a man fitting Armadore's description ran from the scene of the shooting and entered the passenger side of a running, silver vehicle matching the appearance of the defendant's rented Impala. Both the defendant's and Armadore's DNA were found in the Impala, even though Armadore testified at trial that he had never been in that vehicle. Additionally, and perhaps more persuasively, a red, bloodlike substance consistent with being either skin cells, saliva, sweat, or brain tissue, found on the interior of the Impala's front passenger door, possessed genetic characteristics similar to those of the victim. The defendant's own contradictory statements to the police during the course of the investigation are particularly damaging, as they are indicative of an effort to hide his role in the shooting. Further, both the defendant and Armadore testified that they were together the entire evening. The state also presented evidence that, hours after the shooting, Armadore confessed to his girlfriend, Ebrahimi, that he had shot someone that night.

Finally, the state presented particularly strong evidence of motive in the present case. The defendant and the victim had an ongoing dispute over the return of certain jewelry that was in the defendant's possession. Specifically, there was evidence that the defendant, while riding in his Range Rover, previously shot at the victim and his girlfriend. Just three weeks prior to the victim's death, the victim drove by the defendant's residence on Willetts Avenue and shot the defendant in the leg and back. While visiting the defendant at the hospital where he was receiving treatment for those wounds, Armadore stated an intention to seek revenge for the victim's shooting of the defendant.

Because the admission of the defendant's historical CSLI was cumulative of other evidence contained in the record, and because the state presented other signif-

icant evidence of motive, intent, and the defendant's participation in the crime, we conclude that the state met its burden of showing that the admission of that evidence was harmless beyond a reasonable doubt.

## III

The defendant next claims that the Appellate Court erred in concluding that his right to confrontation was not violated by the testimony of the substitute firearms examiner, who testified about the findings of the primary examiner. We agree with the defendant that the Appellate Court erred by not determining that a constitutional violation occurred; however, we conclude that the violation was harmless beyond a reasonable doubt.

## A

The following additional facts and procedural history are relevant to our review of this claim. As stated previously in this opinion, the police recovered five nine millimeter casings from the Willetts Avenue shooting and one nine millimeter casing from the scene of the victim's death. Those casings were then submitted to the state forensic laboratory, where a ballistics analyst, Gerald Petillo, examined the evidence and generated a written report containing his conclusions. James Stephenson, who was also employed at the laboratory at the time, was the "technical reviewer" of Petillo's report. As part of his technical review, Stephenson also physically examined the casings recovered from the two shootings.

Petillo died prior to trial and, therefore, was unavailable to testify. The state subsequently sought to admit testimony from Stephenson in lieu of Petillo. In response, the defendant filed a motion in limine, seeking to preclude Stephenson from testifying and also to exclude any evidence related to the firearms examination conducted in this case. In that motion, the defendant argued that Stephenson would be testifying as a surrogate expert based on Petillo's examination, which would violate the defendant's right to confrontation under *Bullcoming* v. *New Mexico*, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011), and *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). The state opposed the defendant's motion, arguing that there was no confrontation clause violation because Stephenson conducted "his own review and comparison of the actual physical evidence . . . ." Stephenson testified, outside of the jury's presence, that he reviewed Petillo's findings but also conducted his own examination of the evidence and reached his own conclusions. The court then denied the motion to preclude Stephenson's testimony.

At trial, Stephenson testified that, when analysts at the state forensic laboratory examine shell casings, they look for class characteristics such as the manufacturer and caliber designations to determine from what types

of firearms they may have been fired. They then look for "individual marks that occur only during the firing process" that indicate whether the casings came from a sole source. After finding the marks, the objects can then be viewed through a comparison microscope to look "for those areas of agreement that occurred during the firing process to determine whether two objects were fired from the same source."

Stephenson also testified about his role as a technical reviewer. He noted that the primary examiner, Petillo, had conducted an examination of the casings using a comparison microscope. Stephenson then testified that his role as technical reviewer was to look at the same evidence and "to determine whether they came to the same conclusions during the examination process." Specifically, Stephenson noted that the "[t]echnical reviewer was the position of signing off after the . . . review of all the . . . evidence . . . ." He also expressly stated that, if the technical reviewer disagreed with the primary examiner's conclusion that items were fired from the same source, the evidence would have to be reviewed again, and both reviewers would have to come to an agreement, or "it would be an inconclusive result, because the [technical reviewer] couldn't come to the same result as the [primary] examiner had come to during his examination."

Stephenson ultimately testified that his own examination of the .38 caliber casings found near 24 Willetts Avenue led him to conclude that all of the casings had been fired from the same firearm. He also opined as to his scientific conclusion that all of the nine millimeter casings found near 28 Willetts Avenue were fired from the same firearm. Finally, Stephenson testified that his review had also led him to conclude that the nine millimeter cartridge casing found at Ernie's Café was fired from the same firearm that had fired the nine millimeter casings found near 28 Willetts Avenue.

On appeal, the defendant claims that the trial court improperly admitted Stephenson's testimony in violation of his sixth amendment right to confrontation because his testimony was predicated on Petillo's findings and conclusions. The defendant argues that Petillo's findings and conclusions constituted testimonial hearsay and that, because Petillo was unavailable for cross-examination, Stephenson could not testify as to Petillo's conclusions without violating the defendant's constitutional right to confrontation. For the reasons that follow, we agree with the defendant that parts of Stephenson's testimony were improperly used as an implicit conduit for Petillo's findings.

We begin with the applicable standard of review. "Under *Crawford* v. *Washington*, [541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], hearsay statements of an unavailable witness that are testimonial in nature may be admitted in accordance with the confrontation

clause only if the defendant previously has had the opportunity to cross-examine the unavailable witness." *State* v. *Smith*, 289 Conn. 598, 618, 960 A.2d 993 (2008). "Nontestimonial [hearsay] statements, however, are not subject to the confrontation clause and may be admitted under state rules of evidence" if they fall under a hearsay exception. Id. A threshold inquiry of whether the admission of the statement presents a constitutional due process claim is whether the hearsay statement was testimonial in nature, which presents a question of law over which our review is plenary. See, e.g., id., 618–19.

We recently addressed an almost identical claim, also involving expert testimony by Stephenson, who acted as a technical reviewer for Petillo in *State* v. *Lebrick*, 334 Conn. 492, 521–22, 223 A.3d 333 (2020). In *Lebrick*, we held that "Stephenson's testimony was admissible, even if predicated in material part on testimonial hearsay, as long as the underlying hearsay was not admitted into evidence or otherwise put before the jury for the truth of the matter asserted." Id., 527. In that case, we concluded that, "[a]lthough the jury was informed that Stephenson had reviewed 'a number of reports and photographs in preparation for [his] testimony,' the contents of those reports were not presented to the jury. When the state attempted to elicit information regarding 'which reports [Stephenson had] reviewed,' the defendant objected to this line of inquiry, and the trial court implicitly sustained the defendant's objection, ruling that Stephenson's testimony must be limited to 'his own conclusions.' Thus, the jury was not informed of the nature of the reports on which Stephenson had relied, who generated the reports, what information they contained, or whether Stephenson's expert opinions were consistent with the reports." Id. As such, we concluded that the trial court did not err in allowing Stephenson's testimony. See id.

Stephenson's testimony in the present case is, however, meaningfully different from his testimony in *Lebrick*. In the present case, Stephenson testified before the jury that, in his role as the technical reviewer of the primary examiner's analysis, he reviewed Petillo's initial notes. In addition, he informed the jury that, if his independent conclusions, as a technical reviewer, had not matched the primary examiner's (Petillo's), findings, the results would have been considered inconclusive. The defendant claims that, from this general testimony, the jury could have readily inferred that, because the results reached were not considered inconclusive, Petillo's results must have matched Stephenson's. Although it is unclear how the jury would have known whether any aspects of Petillo's findings were deemed inconclusive without his actual conclusions or report having been directly admitted, what made Stephenson's testimony in this case problematic was his direct testimony about Petillo's findings. During Stephenson's direct examina-

tion, the prosecutor specifically inquired if he had reviewed Petillo's findings as to specific conclusions, rather than focusing on Stephenson's own independent analysis and conclusions. For example, at the outset of Stephenson's testimony relating to the examination of specific cartridges, the following colloquy occurred:

"Q: And who was the original examiner in this particular case?

"A: . . . Petillo.

"Q: And what was your role with respect to the examination of those cartridge cases?

"A: Reviewing the cartridge cases in the comparison microscope to make a determination [as to] whether his conclusions were correct at the time.

"Q: And did you come to an opinion as to what his conclusions were?

"A: I did.

"Q. Did you also come to a conclusion as to whether or not, to a reasonable degree of certainty in the field of ballistics or firearms examination, as to whether or not those were all fired from the same clip?

"A: I did.

"Q: And what was your conclusion with respect to that?

"A: They had been fired in the same firearm."

Although Stephenson was asked about his own analysis and conclusions, there were other times during his direct examination when he was shown other pieces of evidence, such as two bullets contained in state's exhibits 62 and 116, which he had no recollection of independently reviewing. When Stephenson was specifically asked about that evidence, he relied on Petillo's findings. Thus, by inquiring directly about Petillo's report with respect to particular pieces of evidence that Stephenson did not have any recollection of independently reviewing, the state indirectly communicated Petillo's findings to the jury through Stephenson's testimony.[13]

We, therefore, disagree with the Appellate Court that "the only inculpatory conclusions or statements regarding the firearms evidence that were presented to the jury were made by Stephenson . . . ." *State* v. *Tyus*, supra, 184 Conn. App. 682. Because the defendant was deprived of the opportunity to cross-examine Petillo with respect to Petillo's conclusions, his constitutional right to confrontation was violated.

B

Having concluded that the trial court committed error by permitting Stephenson to implicitly testify as to Petillo's conclusions, we next turn to the question of whether that particular error requires reversal of the defendant's

conviction, when considered in the context of the record as a whole. Because the defendant's claim is constitutional in nature, the state bears the burden of establishing that this error was harmless beyond a reasonable doubt. See, e.g., *State* v. *Edwards*, 334 Conn. 688, 706–707, 224 A.3d 504 (2020). "That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors . . . . include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Citation omitted; internal quotation marks omitted.) Id., 707.

Stephenson's testimony about Petillo's findings and conclusions was redundant to other evidence presented at trial. First, Stephenson's testimony about his own independent observations and conclusions provided powerful evidence from which the jury could have reasonably concluded that the firearm that the defendant used to fire back at the victim after the December 3, 2006 shooting was the same weapon used to shoot and kill the victim three weeks later. Second, even if Stephenson's testimony had been omitted in its entirety, Johnson's testimony and the physical casings, which were submitted into evidence at trial, firmly established the fact that a nine millimeter semiautomatic firearm was used by the defendant to fire back at the victim on Willetts Avenue. It is likewise undisputed that a casing from a nine millimeter semiautomatic firearm was discovered at the scene of the victim's murder. Thus, even without a detailed forensic examination of the casings admitted into evidence, the jury would still have had a strong evidentiary basis to conclude that the defendant had ready access to the type of firearm that was subsequently used to kill the victim.

As we noted in part II of this opinion, there was also other compelling evidence, including Armadore's CSLI that placed the defendant close to the scene of the crime at the time of the murder, a getaway car that resembled the car rented by the defendant, a bloodlike substance with DNA similar to that of the victim that was found in that car, and a confession by Armadore. There was also strong evidence of motive in that the victim and the defendant had an ongoing dispute over the return of jewelry in the defendant's possession. That feud resulted in two prior shooting incidents, including one in which the victim shot and wounded the defendant three weeks before his murder.

Because Stephenson's testimony regarding Petillo's conclusions was cumulative of other evidence, and because the state presented other significant evidence of intent and of the defendant's guilt and participation in the crime, we conclude that the state met its burden

of showing that the admission of that evidence was harmless beyond a reasonable doubt.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] At trial, Colebut testified that she did not remember any of these events. In response, the state introduced Colebut's prior statement to the police into evidence pursuant to *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).

[2] We note that Armadore's counsel challenged the admission of this statement on appeal by claiming that the witness who overhead this statement had improperly identified him as the speaker for the first time in court, in violation of *State* v. *Dickson*, 322 Conn. 410, 426, 141 A.3d 810 (2016), cert. denied,     U.S.     , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). *State* v. *Armadore*, 186 Conn. App. 140, 153, 198 A.3d 586 (2018), aff'd, 338 Conn. 407, 258 A.3d 601 (2021). The Appellate Court agreed, holding that the identification was improper but concluding that the error was harmless. Id., 156–58. We note that defense counsel made no objection to the admission of this statement.

[3] Betts and the defendant rented a car because Betts, who was pregnant at the time, needed a vehicle in order to get to medical appointments. The defendant was no longer in possession of the blue Range Rover by the time that the shooting occurred, as it had been taken into evidence by the police following the prior shooting on Willetts Avenue.

[4] Although Guilbert, who had consumed several alcoholic beverages that night, could not recall the precise time these events occurred and initially told the police that the defendant may have arrived at Ernie's Café around 11 p.m., he clearly testified that he had learned of the victim's death before the defendant's arrival. He further testified that the defendant offered to buy him a drink but that he declined because he was about to leave. He left and went to the hospital to meet the victim's family.

[5] The jury did not specify whether its verdict against the defendant was based on principal or accessorial liability.

[6] Armadore filed a separate appeal, and his conviction and sentence were affirmed in *State* v. *Armadore*, 338 Conn. 407, 258 A.3d 601 (2021).

[7] The defendant also claims that the Appellate Court improperly upheld the trial court's refusal to give a limiting instruction concerning the firearms examiner's testimony. We agree with the Appellate Court that the trial court's general instruction on expert testimony was sufficient to guide the jury in its assessment of Stephenson's testimony. See *State* v. *Tyus*, supra 184 Conn. App. 682. As the Appellate Court aptly noted, the defendant's requested instruction that "Stephenson's opinions in this case are not to be treated by [the jury] as scientifically definitive" and "that the probability of [Stephenson's] opinion being correct is for [the jury] . . . alone to determine" is substantially similar to the instruction that was actually given. (Internal quotation marks omitted.) Id., 684–85. The jury was instructed that "[s]uch [expert] testimony is presented to you to assist you in your deliberations. No such testimony is binding upon you, however, and you may disregard such testimony either in whole or in part. It is for you to consider the testimony with the other circumstances in the case, and using your best judgment, determine whether you will give any weight to it, and, if so, what weight you will give to it. The testimony is entitled to such weight as you find the expert's qualifications in his or her field entitle it to receive, and it must be considered by you, but it is not controlling upon your judgment." (Internal quotation marks omitted.) Id. Thus, the trial court properly instructed the jury that it alone could assess the credibility of the expert witnesses, including Stephenson. For this reason, we conclude that this claim is wholly without merit.

[8] In his brief to this court and before the Appellate Court, the defendant claimed, for the first time, that the admission of "inflammatory evidence pertaining [solely] to Armadore" unfairly prejudiced [the defendant] because it made him appear violent and guilty by association. The evidence he points to relates to Armadore's testimony about domestic violence incidents between Armadore and his girlfriend. Defense counsel neither objected to any of the evidence that the defendant now claims prejudiced him at trial nor asked the trial court for a limiting instruction regarding that evidence. Because those claims are not properly preserved, we decline to address them. See, e.g., *State* v. *Cabral*, 275 Conn. 514, 530–31, 881 A.2d 247 ("[t]he standard for the preservation of a claim alleging an improper evidentiary

ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling." (Internal quotation marks omitted.)), cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005).

[9] Specifically, as the Appellate Court noted, defense counsel assumed, in his objection to the state's motion for joinder, that "the state will be able to show that Armadore's statement was made (1) while the conspiracy was ongoing and (2) in furtherance of the conspiracy." (Internal quotation marks omitted.) *State* v. *Tyus*, supra, 184 Conn. App. 677 n.5. Counsel also "assume[d] that the state will also have made the threshold showing of the existence of a conspiracy in order that this statement [may] be properly offered, let alone admitted." (Internal quotation marks omitted.) Id.

[10] *Carpenter* was decided approximately one month after the defendant's appeal was argued before the Appellate Court. As such, the defendant also claims that, because the rule announced in *Carpenter* is a new constitutional rule, it applies to all pending cases, regardless of whether the claim was preserved at trial. The state argues that the defendant is not entitled to retroactive application of *Carpenter* because he did not pursue any claim, before either the trial court or the Appellate Court, that his CSLI data should have been suppressed. This court first applied the holding of *Carpenter* in *State* v. *Brown*, 331 Conn. 258, 202 A.3d 1003 (2019). In *Brown*, the police had obtained two months of the defendant's CSLI pursuant to an ex parte order. Id., 265–66. The defendant moved to suppress the CSLI. Id., 268. The appeal in *Brown* was pending before the Appellate Court when *Carpenter* was decided. In *Brown*, this court applied *Carpenter* and held that obtaining CSLI without a warrant violated the defendant's fourth amendment rights. Id., 273. Thus, it is clear that we apply the rule from *Carpenter* retroactively to cases pending on appeal, subject to review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See *Griffith* v. *Kentucky*, 479 U.S. 314, 322, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ("[A]t a minimum, all defendants whose cases [are] still pending on direct appeal at the time of [a law changing] decision should be entitled to invoke the new rule. . . . [F]ailure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication." (Citations omitted; footnote omitted; internal quotation marks omitted.))

[11] We note that there was an objection to the labeling on the printout of Wines' slideshow presentation that identified the defendant by name in relation to the cell phone numbers from which calls were made and received on the night of the shooting. The trial court sustained the objection, and the prosecutor had Wines redact the defendant's name, insofar as it revealed to whom the cell phone numbers were registered or by whom they were used. The printout, thus, showed only which cell phone numbers were activated and where and when they were activated. However, there was other evidence admitted at trial that established that two of these phone numbers were connected to a cell phone registered to or used by the defendant and that the other phone number was connected to a cell phone registered to Armadore.

[12] We observe that there may not be a meaningful distinction between the state's obtaining more or less than seven days of CSLI without a warrant. See *Carpenter* v. *United States*, supra, 138 S. Ct. 2217 ("time-stamped data [provides] an intimate window into a person's life, revealing not only his [or her] particular movements, but through them his [or her] familial, political, professional, religious, and sexual associations" (internal quotation marks omitted)). Allowing CSLI collection for a period of three days, in the absence of compelling reasons or exigent circumstances, may not adequately alleviate those concerns. See id., 2222. Indeed, several of our sister states have concluded that obtaining less than seven days of CSLI may constitute a search for which a warrant is required. See, e.g., *Commonwealth* v. *Wilkerson*, 486 Mass. 159, 165–66, 156 N.E.3d 754 (2020) ("[c]ollecting more than six hours of CSLI data invades a defendant's reasonable expectation of privacy, and, therefore, under the [f]ourth [a]mendment to the United States [c]onstitution . . . requires a warrant supported by a showing of probable cause); *People* v. *Simpson*, 62 Misc. 3d 374, 380, 88 N.Y.S.3d 763 (2018) ("this [c]ourt finds that the period of time in *Carpenter*—seven days—is

less significant to the ultimate decision by the [c]ourt than the underlying rationale supporting the [c]ourt's express holding"); *State* v. *Gibbs*, Docket No. 2017-001846, 2020 WL 4814266, *4 (S.C. App. August 19, 2020) (concluding that CSLI obtained by authorities over five day period constituted search under fourth amendment).

[13] We recognize that, in some cases in which, due to the passage of time and the unavailability of the evidence, such as bodily fluids or DNA samples, a subsequent examiner may by necessity be limited to a review of the analysis of the original examiner, the subsequent examiner should *testify only as to his or her own independent conclusions* based on the review of the analysis conducted by the prior examiner. See, e.g., *Williams* v. *Illinois*, 567 U.S. 50, 56–58, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012) (expert testimony did not violate defendant's right to confrontation when expert reached independent conclusions after relying on DNA report generated by third-party laboratory from rape kit). In this case, Stephenson's direct testimony was not so limited by the state. By contrast, in *Lebrick*, Stephenson testified only about his own conclusions based on comparisons of photographs of the ballistics evidence, without any reference to Petillo's conclusions. *State* v. *Lebrick*, supra, 334 Conn. 527. Although defense counsel did cross-examine Stephenson about Petillo's findings, this is not a situation in which defense counsel opened the door to the admission of Petillo's findings, because the prosecutor indirectly introduced them during Stephenson's direct examination.

_____